## Burkholder *versus* Beetem's Administrators.

1. Beetem, the cashier of an incorporated state bank, shortly after a purchase of stock at $40 per share, sold it to Burkholder at $50. His expression of an apprehension about the time he sold that he would lose by it, did not tend to prove that he had used deceit in the sale.

2. The Act of April 16th 1850, sect. 10 (Banks), imposes a penalty on cashiers dealing in stocks. All contracts in violation of this act are invalidated.

3. The act is a public general one, of which all are bound to take notice.

4. Where an act or contract is prohibited under a penalty, it is unlawful and void, though the statute does not expressly so declare.

5. When a contract prohibited by statute has been executed, both parties being *in pari delicto*, neither can maintain an action to rescind it.

6. The law implies a promise to refund, by a party who has received money under an illegal contract, if the other party does not stand *in pari delicto*.

7. It is not unlawful for a cashier to become an agent to purchase stock.

8. Beetem's stock at the time of the sale was in the name of a third person; if Burkholder had reason to believe that the stock was the third person's and that Beetem was buying from that person as Burkholder's agent, Burkholder was not *particeps criminis* and could recover from Beetem the money paid.

9. Declarations by Beetem to others about the time he sold to Burkholder of the value of the stock was not evidence for Burkholder in a suit by him.

10. Where there is a misjoinder of counts, and the defendant has pleaded to issue, the court cannot require the plaintiff to elect on which he will proceed.

11. A misjoinder of counts is to be taken advantage of by demurrer in the first instance.

May 12th 1870. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Cumberland county:* No. 58, to May Term 1870.

This was an action of assumpsit, brought August 12th 1865 by Henry L. Burkholder against Joseph W. Patton and Joseph A. Stuart, administrators, &c., of William Beetem, deceased. The action was to recover $3000 which the plaintiff at the request of Beetem had given to him, Beetem, to invest for him. The first count of the declaration alleged, that in consideration that the plaintiff would not invest $3000 in United States loan and would intrust it to Beetem to invest, he would invest it more profitably, and the plaintiff gave him the money to invest; that Beetem did not invest it more profitably, but invested it in 60 shares of the

stock of the Glenville Coal Company, which was, as Beetem knew, of little or no value. The second count alleged that Beetem, who was a banker and dealer in stocks, represented that he was well acquainted with the value of stocks, that the plaintiff should pay no more for the investment than Beetem had paid; that Beetem had paid but $40, whilst he represented to the plaintiff that he had paid $50 per share. The common counts were added. There was another count in deceit, alleging that Beetem induced the plaintiff to take 60 shares of stock of the Glenville Coal Company, as purchased from another person, and saying it was of great value (it being Beetem's own stock, and of little value), and Beetem having information, leading him to believe that it would depreciate still more, and that the company shortly afterwards became insolvent. The defendants pleaded non assumpsit.

On the trial, November 9th 1869, before Graham, P. J., the court required the plaintiff to elect between the counts in assumpsit and in tort, and sealed a bill of exceptions. The plaintiff elected to proceed in assumpsit. The plaintiff gave evidence that Beetem had been cashier of the Carlisle Deposit Bank up to his death, which occurred July 26th 1865. He then read from the deposition of H. W. Bickley, a member of the firm of Smith, Randolph & Co. of Philadelphia. The deponent said, that in the latter part of 1864, that firm sold Beetem 1000 shares of Glenville Coal Company stock at $40 per share; the stock was put into the name of Beetem, and he afterwards requested that certain portions of it should be put into the names of other persons. Orders for this were sent to Boston (where it appeared the office of the company was), and the change was made; the market for the stock was in Boston, there was no market for it in Philadelphia. The following, in the deposition, was objected to by the defendants, rejected by the court and a bill of exceptions sealed:—

"I imagine Mr. Beetem looked to no one else but Smith, Randolph & Co. to fulfil the contract of sale; I could not say whether he knew or not for whom he acted; I imagine he knew who were the getters-up of the company. I think that Messrs. Hunter Scott & Co., of this city, were the prime movers in getting up the company, in connection with some Boston men; I cannot speak with certainty, but that is my impression."

The plaintiff then gave in evidence a number of letters from Beetem to Smith, Randolph & Co., from July 27th 1864 until December 27th 1864, showing that he had dealings with them for the Glenville stock and other stocks, and tending to show that he was an extensive speculator in stocks; also that towards the close of 1864 he had reduced his Glenville stock to 800 shares, and had become apprehensive, for reasons referred to in his letters, that the stock had become worthless.

15 P. F. Smith—32

John P. Farley, of Chelsea, Massachusetts, stated in his deposition that Smith, Randolph & Co. sent to Spencer, Vila & Co., of whom deponent was one, 800 shares of Glenville stock to split up into lots; this was done and returned to them, and that Spencer, Vila & Co. had no interest in the stock, but acted as agents of Smith, Randolph & Co.

The answers to the following interrogatories in the deposition were objected to by the defendants, rejected by the court and a bill of exceptions sealed.

1. " Where do you reside, and what business have you been engaged in ?"

" I reside in Chelsea, Massachusetts, and am and have been a banker in Boston."

2. " Did you know the late William M. Beetem, of the borough of Carlisle, state of Pennsylvania ? If yea, for what length of time were you acquainted with him ?" He answered as follows :

" I never knew him."

7. " How was the stock of the Glenville company issued ? How were the subscriptions to that capital stock made out, and to whom paid ? In the transfers from Beetem, and issuing certificates to Burkholder and others, was money paid to the company or its officers for this stock, or was it an arrangement made merely to carry out the views of the said Beetem ? Annex any memoranda from the books of the company showing the transfer of the Beetem stock, or anything on the books explaining how it was held, and how and to whom transferred."

" I know nothing of the company. No money was paid by us, that I recollect, to any one, nor do I know anything of the occasion or object of the transfer."

George L. Huntingdon, treasurer of the Glenville Company, stated in his deposition :—

4. " The books of the Glenville Coal Company show that William M. Beetem was the holder of *800 shares of stock*, and that a certificate of the same was issued to him October 27th 1864, as one of the original subscribers to the capital stock of the company."

7. " The books of the company show that the capital stock was subscribed for by various parties, and among them by William M. Beetem for 800 shares, and that the amount of these subscriptions was paid in cash to the treasurer, on the 20th of August 1864. In the following order certificates appear to have been issued to the various subscribers for the number of shares subscribed for by them, and among them the certificate to William M. Beetem, as stated in answer to the fourth interrogatory. In the transfers from Beetem and issuing certificates to Burkholder and others, the books do not show that money was paid to the company or its

[Burkholder *v.* Beetem.]

officers, [and I presume it was an arrangement made to carry out the views of said Beetem.]"

The court would not allow the portion of the 7th answer in brackets to be read, and sealed a bill of exceptions for the plaintiff.

The plaintiff gave in evidence the following papers:—

Power of attorney on back of the certificate:

"For value received I hereby sell, transfer and assign to Spencer, Vila & Co. eight hundred shares in the capital stock of the Glenville Coal Company within mentioned, and authorize C. H. H. Cook as my attorney to make the necessary transfer on the books of the company.          WILLIAM M. BEETEM."

"For value received, I hereby sell and transfer to Spencer, Vila & Co. 800 shares of the Glenville Coal Company.

"Dated this 18th day of January, A. D. 1865.

WILLIAM M. BEETEM,
Per C. H. H. COOK, Attorney."

"For value received, we hereby sell and transfer unto Miss Martha C. Duncan, of Philadelphia, forty shares in the Glenville Coal Company.

"Dated this 18th day of January, A. D. 1865.

SPENCER, VILA & CO."

"For value received, we hereby sell and transfer unto Henry L. Burkholder, of Philadelphia, sixty shares in the Glenville Coal Company.

"Dated this 18th day of January, A. D. 1865.

SPENCER, VILA & CO."

"For value received, we hereby sell and transfer unto Smith, Randolph & Co., 700 shares in Glenville Coal Company.

"January 18th 1865.          SPENCER, VILA & CO."

Certificate No. 96, Glenville Coal Company for sixty shares stock to Henry L. Burkholder, dated Boston, January 18th 1865.

Plaintiff offered to prove by J. A. Murray, "that at or about the time of the sale to plaintiff, Beetem was dealing in stocks, and in Glenville stock clandestinely, under other names, and sold and transferred twenty shares of the stock to the witness, at $50 per share, which he represented to be its true value, and a safe investment, and that it had no real value at the time, and he knew it; this for the purpose of showing that Mr. Beetem was gambling and dealing in stock, contrary to the provisions of the Act of Assembly; and for the purpose of invalidating his sale and transfer of said stock to Mr. Burkholder, and enabling him to recover back the money paid for it."

This was objected to by the defendant, rejected and a bill of exceptions sealed.

[Burkholder *v.* Beetem.]

Plaintiff offered to prove by John Stuart, "that Mr. Beetem, to whom witness had proposed to buy government bonds, told him, he would get him something better, Glenville Coal stock, and representing the stock as not his own, but only procurable by him for a few of his friends; and the witness placed in his hands $1000 for investment. That the witness in the interval felt dissatisfied with the investment, and came on the next day to revoke the order, and Beetem then told him it was too late; that the order had already gone off; and in return for the $1000 of money, he the witness received a certificate for twenty shares of the Glenville stock, to be followed by proof, that it was part of the stock which Beetem had acquired from Smith, Randolph & Co. This transaction was about the same time as Burkholder's, and offered for the same purpose as in the last appendix."

This was objected to by defendants, rejected and a bill of exceptions sealed.

The plaintiff offered to show by D. H. Mahon, "that as an appraiser of Martha Duncan's estate, he asked Beetem in the spring of 1865, the value of the Glenville stock, that he said $50 per share; that Beetem then knew it was worth but $5 per share; to followed by proof that 640 shares had been appraised in Beetem's estate at $5 per share." He offered the inventory of Beetem's estate; the offers were rejected and bills of exceptions sealed.

Plaintiff offered to prove by C. W. Weaver, that in November 1864 wishing to invest $3500 in government bonds, he applied to Beetem who advised him to invest in Glenville and Shamokin stock which would pay from 12 to 20 per cent. per annum; that afterwards on witness asking Beetem why he did not keep it himself, he said, he did not want everybody to have it, he wished it for particular friends, it would be the best paying stock in the country, &c.

The offer was rejected and a bill of exceptions sealed.

The plaintiff then gave evidence of the payment by him to Beetem on the 4th of February 1864, of $2499.84 by a check and $500 by a note.

The defendant gave no evidence.

The plaintiff's points and the answers were:—

1. If William M. Beetem was cashier of the Carlisle Deposit Bank, and well acquainted with the stock market, &c., and had superior means of knowledge, when Mr. Burkholder, by his course of life, was ignorant of these things, and under such circumstances Beetem sold Burkholder a stock·at its full par value, when it really had in Philadelphia no market value; this fraud was sufficient to authorize Burkholder to repudiate the contract, and recover the money.

Answer: "We cannot answer this in the affirmative.—If there were no representations made by Beetem of its value, the fact of

[Burkholder *v.* Beetem.]

its being of no value, or not valuable in Philadelphia, if it was of value, and sales made in Boston would not be sufficient to avoid the contract."

2. If Beetem, cashier of a bank, and forbidden by statute to deal in stocks, used means to deceive Burkholder as to the ownership of the stock sold him, as by keeping the certificate in Boston, or Philadelphia, and first giving a power of attorney to Smith, Randolph & Co., and then transferring the stock in New England to Spencer, Vila & Co., such devices would be a fraud on Burkholder, and the statute would avoid the contract, and Burkholder may recover his money.

Answer: "The facts recited in this point would not of themselves be sufficient to avoid the contract."

4. If the jury believe that Mr. Beetem, being cashier of the Carlisle Deposit Bank at the time, received from Henry L. Burkholder, on the 4th day of February 1865, the sum of $3000 for sixty shares of Glenville Coal stock, which was really his own stock, but which fact he studiously concealed, and he was, at the time, clandestinely dealing and gambling in this stock under cover of brokers in Philadelphia and Boston, and he put upon the plaintiff these 60 shares of Glenville stock as a mere gambling and speculative stock at the time, without Burkholder's knowing it was Beetem's stock he was buying, and uninformed as to its real value, their verdict should be for the plaintiff for the $3000, and the interest from the time Beetem received it.

Answer: "We cannot say that, under the facts stated in this point, Mr. Burkholder's being misinformed as to the value of the stock he purchased, would be sufficient to authorize Mr. Burkholder to rescind or avoid the contract. To authorize Mr. Burkholder to rescind the contract, it would be necessary that he should be misinformed by Mr. Beetem as to the value of the stock he purchased."

Judge Graham amongst other things charged :—

* * * [ "If the first two counts set forth a good cause of action, and it may be doubted whether the consideration alleged would sustain a promise, then we recollect no evidence to sustain the special contract set out. There is no evidence in the case, that we remember, to show any agreement, contract or representation between the parties, in reference to the purchase of stock by Beetem for the plaintiff.]

"But the plaintiff contends that he can recover on the money counts, that the purchase and sale of stock by Mr. Beetem, he being the cashier of the Carlisle Deposit Bank at the time, was illegal, and contrary to the provisions of the Act of Assembly of 15th of April 1850, which enacts as follows: 'If any cashier of a bank shall directly or indirectly engage in the purchase or sale of stocks, or in any profession, occupation or calling other

[Burkholder *v.* Beetem.]

than that of his duties of cashier, such cashier, upon conviction thereof, in any court of criminal jurisdiction, shall be sentenced to pay a fine not exceeding five hundred dollars.'

" This is a penal statute, and subjects any cashier of a bank who shall directly or indirectly engage in the purchase and sale of stocks to a criminal prosecution, and on conviction to a fine not exceeding $500. [The act operates on the party violating its provisions, but is silent as to the validity of a contract for the purchase or sale of stock in violation of its provisions; but it is a well-established principle of law that it will not enforce a contract made in violation of its provisions, known by both parties under the circumstances. The law will not afford its aid to either party, either to enforce or rescind the contract, but leave them in the position they have placed themselves.] [But in this case the plaintiff alleges that he is an innocent party; that he supposed Beetem was purchasing the stock for him; that he had no knowledge that Beetem was dealing in stock, or ordered the stock and intended to sell his own stock to him. That this was kept studiously concealed by Mr. Beetem, and that there is nothing in the Act of Assembly to prevent the cashier of a bank from purchasing stock for another. Under these circumstances, if Burkholder was not a party knowingly to the illegal transaction of Beetem he would not be affected by it, or precluded from rescinding the contract on the ground of fraud.]

[ " The question then involved in this case as we look at it is, Was there any fraud, deceit, false representations or concealment of the truth with a fraudulent intent, acted or practised by Beetem to induce Burkholder to purchase this stock ? If there was, then the plaintiff may rescind the contract and recover the money paid. If, on the contrary, the purchase was fair and honest, not induced by any deceit or misrepresentation on the part of Beetem, the plaintiff cannot recover.] [But fraud must be proved; it cannot be presumed; but there may be facts and circumstances proved from which the inference of fraud is a reasonable conclusion, and your minds must be satisfied reasonably well from the evidence that there was fraud or deceit practised by Beetem on Burkholder, to induce him to make the purchase, to justify a rescission of the contract and a verdict for the plaintiff."] * * *

The verdict was for the defendants. The plaintiff took a writ of error.

1, 2 and 3. Assignments of error were the answers to the points.

4, 5, 6 and 8. The parts of the charge in brackets.

9. That the charge as a whole was contradictory and calculated to mislead the jury.

10. Rejecting part of Bickley's deposition.

11–13. Rejecting parts of Farley's deposition.

14. Rejecting part of Huntingdon's deposition.

[Burkholder v. Beetem.]

15–18. Rejecting the testimony of Murray, Stuart, Mahon and Weaver.

19. Rejecting the inventory of Beetem's estate.

20. Putting the plaintiff to his election of his counts.

*W. M. Penrose* and *W. H. Miller*, for plaintiff in error.—The presumption was that Beetem was selling the stock for others—for that would have been a lawful act, whilst selling for himself was unlawful. Burkholder was thrown off his guard. Beetem owning the stock, the sale was a fraud: Addison on Contracts 130, 133; Pearce *v.* Blackwell, 12 Iredell 49; Lewis *v.* Davison, 4 M. & W. 654; 1 Greenl. Ev., § 80; Simons *v.* Vulcan Oil Co., 11 P. F. Smith 202; 1 Story's Eq. Juris., § 315 and note 1; 1 Parsons on Contr. 74, 75. The Act of April 16th 1850, § 10, Pamph. L. 481, Purd. 90. pl. 25, imposes a penalty on a cashier engaging in the purchase and sale of stocks and is therefore a prohibition: Bartlett *v.* Vinor, Carth. 257; Skinner 322; Drury *v.* Defontaine, 1 Taunton 136; Bensley *v.* Bignold, 5 B. & Ald. 335; Columbia Bridge *v.* Haldeman, 7 W. & S. 235; Cope *v.* Rowlands, 2 M. & W. 149; Furgusson *v.* Norman, 5 Bing. N. C. 76; 1 Kent's Com. 467. Whilst such prohibited contract remains executory, either party may rescind: Addison on Contr. 67, 150; 2 Starkie on Ev. 113, &c. If the contract is unlawful only on the part of one, the other may recover back his money, although it has been executed: Williams *v.* Hedley, 8 East 378; Pearsoll *v.* Chapin, 8 Wright 7; Harner *v.* Fisher, 8 P. F. Smith 453; Funk *v.* Ely *et al.,* 9 Wright 444; Caldwell *v.* Boyd, 7 P. F. Smith 322; Stone *v.* Hays, 3 Denio 575; Willink *v.* Vanderver, 1 Barb. 599; 1 Starkie's Evidence 34, &c. One cannot act as agent for the purchaser and be himself the seller: Gould *v.* Gould, 36 Barb. 271; 6 Madd. Ch. R. 367; Conkey *v.* Bond, 34 Barb. 276; Aberdeen Railway Co. *v.* Blaikie, 1 Macq. 461.

*Henderson & Hays*, for defendants in error.—A rescission of the contract, dependent upon a retransfer of the stock, was necessary before suit brought to entitle the plaintiff to recover in this action: Roth *v.* Crissy, 6 Casey 145; The Turnpike Co. *v.* The Commonwealth, 2 Watts 433; Duncan *v.* Lawrence, 12 Harris 157.

The opinion of the court was delivered, July 7th 1870, by

SHARSWOOD, J.—There have been twenty errors assigned on this record; but as the counsel for the plaintiff concede in their printed argument, all those which are founded upon the charge and the answers of the court to the points presented are resolvable into two questions. The first is as to the character of the relation between the parties, and the second as to the effect of the Act of

Assembly of April 15th 1850, sect. 10, art. 5th, Pamph. L. 482, entitled "An Act regulating Banks."

The action was instituted to recover from the defendant as administrator of William M. Beetem, who in his lifetime was cashier of the Carlisle Deposit Bank, the sum of $3000 alleged to have been paid to him by the plaintiff as the consideration for the purchase of sixty shares of stock of the Glenville Coal Company. The ground of it was that the contract of sale was fraudulent or illegal, and the plaintiff claimed the right to rescind it and recover back the purchase-money.

The evidence was very bald and meagre as to the circumstances of the sale. It tended to show that Beetem was the owner of 800 shares of the stock, which he had transferred to Spencer, Vila & Co. of Boston to hold for him: then a transfer of sixty of the shares by them to the plaintiff, dated January 18th 1865, and the payment by the plaintiff to Beetem of $2499.84 by a check dated February 4th 1865, and a note of the plaintiff of the same date, to the order of and endorsed by G. W. Hilton, for $500, which was deposited by Beetem in the Carlisle Deposit Bank as cash and paid April 8th 1865. In addition there were in evidence letters from Beetem to his brokers in Philadelphia, relating to the purchase for him of the 800 shares, from which it might be inferred that at the close of the year 1864 he apprehended loss by the investment or speculation. On the supposition that Burkholder and Beetem were simply vendor and vendee there certainly was no evidence of any misrepresentation or fraud in the sale. Beetem bought the stock at $40 a share, and his mere expression of an apprehension that he would lose certainly did not even tend to prove that he had used any deceit in the subsequent disposition. It was urged that the fact that the stock stood in the names of Spencer, Vila & Co., and that the transfer was direct from them to the plaintiff, was sufficient primâ facie to authorize the inference that Beetem had acted as the agent of Burkholder in making the purchase, and had concealed from him the fact that he was the beneficial owner. Substantially the court in their answer to the plaintiff's sixth point, submitted this question to the jury. "If Mr. Beetem in place of making a purchase of the stock for Mr. Burkholder, in fact had stock, which he then held, assigned through another to Mr. Burkholder at greatly more than he knew to be its actual value, this would authorize a rescission of the contract by Mr. Burkholder and a recovery of the money paid by him to Beetem." There was no evidence in the case, as the court properly instructed the jury in their charge, to show any agreement, contract or representation between the parties in reference to the purchase of stock by Beetem for the plaintiff. The first four assignments of error are therefore not sustained.

But the more important question in the cause is as to the effect

[Burkholder *v.* Beetem.]

of the Act of 1850.   It provides "that it shall not be lawful for
the cashier of any bank to engage in any other profession, occu-
pation or calling, either directly or indirectly, than that of the
duties appertaining to the office of cashier; and if any cashier of
the bank shall directly or indirectly engage in the purchase and
sale of stocks, or in any other profession, occupation or calling
other than that of his duties of cashier, such cashier upon convic-
tion thereof in any court of criminal jurisdiction shall be sen-
tenced to pay a fine not exceeding $500."   The main object of
this provision undoubtedly was the security of the bank—to
remove from the cashier, who necessarily has possession and
control of the money and securities, all temptation to use such
funds in his private speculations.   Yet it cannot be questioned
that, according to well-established principles, it invalidated all his
contracts contrary to its mandate.   The act is a public general
statute of which all are bound to take notice.   When an act or
contract is prohibited under a penalty, it is unlawful and void,
though the statute does not expressly so declare: Mitchell *v.*
Smith, 1 Binn. 110; Seidenbender *v.* Charles's Adm., 4 S. & R.
151; Columbia Bank and Bridge Co. *v.* Haldeman, 7 W. & S.
233.   In Hall *v.* Franklin, 3 Mee. & Welsby 259, to an action
of assumpsit by the endorsees against the endorser of a bill of
exchange, the defendant pleaded that the bill was made and en-
dorsed after the passing of the statute 17 Geo. 3, c. 99, which
restrained spiritual persons from being occupied in any trade or
dealing, that the plaintiffs were a banking company, of which
certain spiritual persons holding benefices were partners and
members, whereby said endorsement and promise in the declara-
tion mentioned were void, it was held on demurrer that the plea
was good.   And see Young *v.* Robertson, 23 Legal Int. 365, a
case decided in the District Court of Philadelphia on this pro-
vision of the Act of 1850.   The proviso to the section of the Act
of 1850 in question is, that it "shall not be construed in such
manner as to prevent any cashier from managing his own real
estate or private property as heretofore, if such private property
be not vested in mercantile, mechanical or manufacturing opera-
tions."   It may be that a purchase of stock in a coal company
for investment merely, or a subsequent sale, would not be within
the prohibition, but when there is evidence, as there was in this
case, that the cashier was engaged in speculating in stocks—
buying for the mere purpose of making profit by a rise in the
market price, especially when he was engaged in more than one
transaction of the kind, the case is clearly within both the letter
and spirit of the act.   It is true that when a contract so prohibited
by statute has been executed, both parties being *in pari delicto,*
an action cannot be maintained by either party to rescind the
contract: Addison on Contracts 149; Boutelle *v.* Melendy, 19

[Burkholder *v.* Beetem.]

N. H. 196. The party who has paid the consideration cannot recover it back. But the law implies a promise to refund money had and received under an illegal contract where the plaintiff seeking to recover such money does not stand *in pari delicto* with the person who has received it, and from whom it is sought to be recovered: Addison on Cont. 67. Upon the evidence then was Burkholder the plaintiff *in pari delicto* with Beetem? Upon the face of the transaction, so far as it appears that he had any knowledge of it, he did not purchase the stock of Beetem, but of Spencer, Vila & Co. There is no evidence that he knew that the stock belonged to Beetem. There was nothing unlawful in the employment of a cashier as an agent to purchase the stock. The learned judge below recognised this to be the law, and instructed the jury that if Burkholder was not a party knowingly to the illegal transaction of Beetem he would not be affected by it, or precluded from rescinding the contract on the ground of fraud. He then proceeds to submit to them the question of fraud : " Was there any fraud, deceit, false representation or concealment of the truth with a fraudulent intent, acted or practised by Beetem, to induce Burkholder to purchase this stock? If there was, then the plaintiff may rescind the contract and recover the money paid. If on the contrary the purchase was fair and honest, not induced by any deceit or misrepresentation on the part of Beetem, the plaintiff cannot recover." But if the facts were as supposed, why was this limit placed upon the right of rescission—why was Burkholder at liberty to rescind the contract only on the ground of fraud and not simply on the ground of illegality? If Burkholder had every reason to believe that he was purchasing of Spencer, Vila & Co., and that he was paying the money to Beetem for them, and there was no evidence to show that he knew that Beetem was violating the law by indirectly selling stocks, he must be regarded as an entirely innocent party. He was not *particeps criminis*, and there was nothing to preclude him from setting up the illegality of the contract, and recovering back the money paid. We think, therefore, that the learned judge erred in this instruction to the jury, and the 6th, 7th and 8th assignments of error are sustained.

We see no error in the several bills of exceptions on account of the rejection of testimony. The imaginations, thoughts, impressions and presumptions of witnesses who know nothing of the facts are surely inadmissible. When a witness states in a deposition no material facts, but denies his knowledge of any of the matters inquired of, the whole may be rejected as irrelevant, unless some special object is to be attained by showing his want of knowledge. That does not appear in regard to Farley's deposition ; at least it was not stated that it was offered for that purpose. Transactions by Beetem with other persons, or representations made by him to

[Burkholder v. Beetem.]

others as to the value of Glenville stock were clearly inadmissible; nor was the inventory of his estate, as to the appraised value of this stock in August 1865 at all relevant. This disposes of all the remaining errors except the 20th.

There were several counts in the declaration, some in form *ex contractu*, and one in tort. At the opening of the cause the court required the plaintiff to elect on which counts he would proceed. The plaintiff then elected to proceed on the counts in assumpsit, and excepted to the ruling of the court. This is certainly a novel proceeding. I have looked in vain through the books for any precedent or authority to justify it. The mode of taking advantage of a misjoinder of counts is by demurrer in the first instance. The English books say that the declaration will be bad on general demurrer, in arrest of judgment or upon error: 1 Chitty on Pl. 206; 1 Saund. Pl. & Ev. 418; Brigden v. Parkes, 2 Bos. & Pul. 424. But in Martin v. Stille, 3 Whart. 337, in very much such a misjoinder as here, it was held that it could only be taken advantage of by special demurrer. In some cases in England a misjoinder will be aided by intendment after verdict: 1 Saund. Pl. & Ev. 418. If the defendant chooses to plead in bar, and go to trial on such a declaration, there is no authority in the judge to strike out any count, or to put the plaintiff to his election between a count in assumpsit and another in tort. For this error, however, we would not reverse; for it is plain that it did the plaintiff no harm. There was no evidence which he could have given under the count which he abandoned which was not admissible under the money counts.

Judgment reversed, and *venire facias de novo* awarded.