359 A.2d 803

**CONTRACTOR INDUSTRIES and Acceptance Corporation**

v.

**Edna B. ZERR, Appellant.**

Superior Court of Pennsylvania.

June 28, 1976.

94

Michael A. Nemec, Braddock, for appellant.
Gilbert M. Gerber, Pittsburgh, for appellee.

SPAETH, Judge:

This appeal is from a judgment entered on an action in assumpsit to recover the contract price of an above-ground swimming pool installed by appellee in appellant's front yard.

On July 15, 1972, appellant signed a work order for the pool to be installed. The work order provided that appellant should get the building permit, but she did not. On August 8, 1972, almost immediately after the pool had been installed, the municipal authorities notified appellant that the location of the pool violated a local ordi-

nance.[1] Appellant made a written demand upon appellee to remove the pool. When appellee refused, she dismantled the pool with the assistance of a young man, to whom she paid $30, and stored the pool in her basement.

On October 26, 1972, appellee brought the present action. The case was tried before a judge sitting without a jury on October 18, 1974.[2] The judge awarded appellee a verdict of $2,398, representing appellee's costs for labor and materials; no award was made for loss of profit. (Memorandum Opinion at 1).[3]

In her exceptions to the verdict, filed pursuant to Pa. R.Civ.P. 1038(d), appellant principally argued that the verdict was legally erroneous "as formation of a contract cannot occur where the transaction or performance is void by statute." Three other exceptions, although stated as separate propositions, were really corollaries of this argument. Thus, appellant contended that the verdict enforced an illegal agreement, that there was a failure of consideration, and that the contract was prompt-

1. Borough of Crafton Ordinance No. 1250, made a part of the record in this case, provided in Section III that prior to construction of any swimming pool, plans and specifications and an application for a permit must be submitted to the borough building inspector. Section IV(b) provided that "[t]he pool shall be located at the rear of the building and never in the front or side of the house." The ordinance was enacted in September, 1967.

2. A default judgment had been entered against appellant for the full contract price of $3,295 on November 27, 1972. Appellant, however, secured legal representation from the Neighborhood Legal Services Association, and the judgment was opened on July 20, 1973. On November 16, 1973, a panel of arbitrators made a finding in favor of appellant, one arbitrator dissenting. On November 30, 1973, appellee filed an appeal from arbitration.

3. The figure $2,398 was established by the testimony of Anthony Mercurio, appellee's expediter and Assistant to the Secretary-Treasurer, who stated that appellee had spent $1,780 to procure the pool from its distributor, and had incurred $618 in labor costs to assemble the pool in appellant's front yard. Mr. Mercurio broke down the $618: $50 to place the unassembled pool on a truck and transport it to the job site, the balance to on-site installation.

ly and properly rescinded by her. Appellant also argued that "plaintiff [appellee] has increased its harm by its own negligence and by unreasonably refusing to mitigate its harm in not taking back its swimming pool."

At trial and presumably during argument against the exceptions, appellee conceded that the pool had been erected in violation of the local ordinance (N.T. 16); it took the position that it could nonetheless recover since it was appellant's responsibility to get the building permit. Since appellant did not fulfil this responsibility, appellee reasoned, she was the party more at fault, and the doctrine of *in pari delicto* therefore did not preclude appellee's recovery.[4] The court *en banc* accepted this argument:

> The law of the Commonwealth of Pennsylvania is clear that relief may be granted on a contract otherwise against public policy or illegal where the parties are not in pari delicto. This case provides an excellent example for the application of this rule. The loss to the plaintiff was brought about by the defendant's breach of her clearly expressed duty. While not awarding the plaintiff loss of profit, the Court has

---

4. "In the case of a bilateral contract requiring an illegal performance, the illegality being due to facts known to one of the parties but not to the other, the innocent party can often maintain an action for breach of contract by the guilty one, although the latter could not enforce the promise of the former." 1 A. Corbin, Contracts § 146 at 636–637 (1963). *See also* 6A *Id.* § 1373 at 4 (1962); *Peyton v. Margiotti,* 398 Pa. 86, 93, 156 A.2d 865, 868 (1959); *Palmer v. Foley,* 305 Pa. 169, 175–176, 157 A. 474, 476 (1931); *Burkholder v. Beetem's Adm'rs,* 65 Pa. 496, 506 (1870); Restatement, Contracts § 604, at 1120–1121 (1932).

We note that invocation of the doctrine of *in pari delicto* is inappropriate where the conduct of the party seeking its aid outrages public policy more than that of the party against whom recovery is sought. Appellee argues that public policy will be advanced by allowing it to retain its recovery against appellant (Appellee's brief at 3–4). We need not consider this argument (although on the facts of this case it is hardly compelling), for it presupposes the existence of an illegal contract, and for reasons that will appear, we have concluded that the contract was not illegal.

awarded the plaintiff the out of pocket loss sustained by the plaintiff as a result of the defendant's breach of the defendant's clearly defined duty.

(Memorandum Opinion at 2.) The court *en banc* did not address appellant's mitigation argument.

On this appeal appellant has worded her arguments somewhat differently than she did before the court *en banc*, but again, the arguments come down to two issues: Was the contract illegal? If not, did appellee fail to mitigate its damages?

## I

## WAS THE CONTRACT ILLEGAL?

### -A-

A court's refusal to enforce an illegal contract is motivated by a desire to promote goals transcending the isolated litigation before the court:

> "The principle of public policy is, that no court will lend its aid to a man who grounds his action upon an immoral or illegal act . . . [P]rinciples of public convenience demand that the justice of the case shall yield to higher considerations, the operation of the precedent on public morals and the public interest. It is for these reasons courts of justice will not assist an illegal transaction in any respect."

*Fowler v. Scully*, 72 Pa. 456, 467 (1872) (quoting YEATES, J.).

A contract is illegal "if either its formation or its performance is criminal, tortious, or otherwise opposed to public policy." Restatement, Contracts § 512 (1932). *See O'Brien v. O'Brien Steel Constr. Co.*, 440 Pa. 375, 379, 271 A.2d 254, 256 (1970). The illegality must appear from the plaintiff's statement of his cause of action. *Holt v. Green*, 73 Pa. 198, 201 (1873); Restatement, Contracts § 598, comment a, at 1110 (1932). The

test for determining whether a contract should be denied enforcement because of illegality was concisely stated by Lord MANSFIELD:

> If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa or the transgression of a positive law of this country, there the court says he has no right to be assisted.

*Homan v. Johnson,* 1 Cowper 341 (1775), *quoted in* F. Kessler & G. Gilmore Contracts 60–61 (1970).

–B–

In considering whether the contract here was illegal, it is necessary to review the facts.

Appellant, an unemployed widow, decided to purchase a swimming pool for the use of her granddaughter, who suffers from polio. Since the pool was intended for her granddaughter's benefit, appellant's son-in-law had indicated to appellant that he would pay for part of the pool's cost.

As has been already mentioned, appellant executed a "Work Order" on July 15, 1972. This document was signed in the presence of Bill Martin, a salesman employed by appellee. (Although Martin's signature does not appear on the work order, he did sign a "Notice of Application for Consumer Credit" simultaneously furnished to appellant pursuant to federal law. Martin did not testify at trial.)

The work order did not specify where the pool was to be installed. Appellant, however, discussed this with Martin. Since there were large rock formations in the rear yard and inadequate space in either the side or rear yards to construct a pool (N.T. 19), and since in any event appellant owned neither the side nor rear yard (N.T. 33), it was decided that the pool should go in the front of the house (*id.*).

The work order did specify the pool's dimensions and certain "extras" which were to be provided. Near the

middle of the work order, in printed parallel columns, appellee enumerated the items that it would supply as part of the purchase price, and also the items that the customer was to supply:

Install 1 Pool [dimensions]
Including:
Steel Channels and Camber Bars
Kiln Dried Douglas Fir
Tedlar Laminated Decks
Bottom Main Drain
4' Depth
Chrome Over Brass Fittings
Lock-up Steps
S.S. Ladder
Privacy Fence
Sand Filtration System

Customer Supplies:
Painting or Staining
Electrical
Permit
Water

The court *en banc* found that "[t]he contract is very clear, and the provision which provides the defendant with the responsibility of obtaining the permit stands out in very prominent fashion." (Memorandum Opinion at 2.) We do not agree with this characterization.[5] Nonetheless, under the rather stringent decisional law of this Commonwealth, appellant cannot derive any benefit from her conceded failure to read the work order and to notice her obligation to provide the building permit (N.T. 39, 41). *Sands v. Granite Mutual Ins. Co.*, 232 Pa.

---

**5.** *Cf.* Uniform Commercial Code, Act of April 6, 1953, P.L. 3, § 1–201, eff. July 1, 1954, Reenacted October 2, 1959, P.L. 1023, § 1, eff. January 1, 1960, Amended August 24, 1963, P.L. 1213, § 1, 12A P.S. § 1–201(10) ("A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it . . . Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color.")

Super. 70, 80, 331 A.2d 711, 716 (1974); *Rosner v. Zurich Ins. Co.*, 197 Pa.Super. 90, 94, 177 A.2d 30, 32 (1962); *Silberman v. Crane*, 158 Pa.Super. 186, 188, 44 A.2d 598, 599 (1945).[6]

From these facts it is apparent that the contract between appellant and appellee was not illegal. The parties contracted for the installation of a swimming pool; neither the subject matter of the contract, nor its performance, was illegal. *Cf.* Restatement, Contracts § 512 (1932). Appellant and appellee, at least theoretically, allocated between themselves the responsibility of supplying the requisite building permit and hence complying with the legal requirements imposed by the Borough of Crafton. Presumably, had appellant applied for a permit to construct a swimming pool in her front yard, it would have been denied, and this litigation would have been averted.

Nor does illegality appear from appellee's statement of its cause of action. *Holt v. Green, supra.* The complaint simply alleges the contract to purchase the pool, proper installation of the pool, demand for payment, and refusal to pay.

■■ At most what is involved here is a collateral illegality that does not affect the enforceability of the contract. *O'Brien v. O'Brien Steel Constr. Co., supra* at 380, 271 A.2d at 256 (alleged criminal violations of Internal Revenue Code do not vitiate enforceability of otherwise legal transaction). The parties entered into a valid contract for a valid purpose; it eventuated that the location of the pool violated an ordinance of the Borough of Crafton. Violation of a municipal ordinance may sometimes render a contractual bargain illegal, but

6. Appellant testified that "I am in the habit of signing things when I don't read. I just took the [salesman's] word." (N.T. 41). She presented no evidence, however, that she was overreached by appellee. *Cf. Harrison v. Welsh*, 295 Pa. 501, 506, 145 A. 507 (1929).

this is so where either the formation or performance of the contract is forbidden. Restatement, Contracts § 580, Illustration (a)(2), at 1089; 6A A. Corbin, Contracts § 1539, at 832 (1962). This is not such a case. *But cf. Miller v. Stump*, 159 Pa.Super. 124, 125–126, 46 A.2d 331 (1946) (by implication).[7]

## II

## DID APPELLEE FAIL TO MITIGATE ITS DAMAGES?

### –A–

■ It is axiomatic that a party may not recover contract damages that were foreseeable and avoidable. Restatement, Contracts § 336, at 535 (1932). This rule is applicable to appellee's claim against appellant:

> The rule that a party cannot recover damages from a defaulting defendant which could have been avoided by the exercise of reasonable care and effort is applicable to all types of contracts.

*Henry Shenk Co. v. Erie County*, 319 Pa. 100, 109, 178 A. 662, 666 (1935). *See also Gaylord Builders, Inc. v. Richmond Metal Mfg. Corp.*, 186 Pa.Super. 100, 104, 140 A. 2d 358, 359 (1958). The question presented is therefore one of fact.

7. The plaintiff in *Miller* was allowed to recover for the installation of a sidewalk that did not comply with the grade requirements of a municipal ordinance. The court, in affirming the denial of the defendant's motion for judgment n. o. v., emphasized that the defendant had insisted that the sidewalk be installed regardless of the borough ordinance. In addition, although the municipality refused to approve the work, it had not insisted that the trivial variation in the grade be corrected.

*Miller* could perhaps be read as implying that where the variation from the requirements of the ordinance is substantial, and where, as here, the municipality insists upon correction or removal of the illegality, the contract should not be enforced. *Miller*, however, was a brief *per curiam* opinion, and we are unwilling to draw such a conclusion by implication, especially where established decisional law points in the other direction.

–B–

The interrogatories propounded by appellant to appellee, and appellee's answers, were made a part of the evidence in this case. Appellee stated that in the twelve month period preceding the installation done on appellant's property, it had installed approximately seventy-five to eighty above-ground pools. It appears that in 1971 (the year before the installation on appellant's property) appellee had installed an above-ground pool, not simply in the Borough of Crafton but on the same block as the one on which appellant's home is located (Interrogatory 8). It further appears that it was appellee's practice never to ascertain from the appropriate municipal officer whether local law required that a permit be furnished (Interrogatories 4, 5, 6, 7, 10, 11, 12, 16, 17, 18). Indeed, appellee's answer to the interrogatories state that when its employees arrived at the job site, they would not even ask the customer whether any required building permit had been obtained (Interrogatories 13, 19). More specifically, the answers also state that none of appellee's employees asked appellant whether she had obtained the permit required by the Borough of Crafton (Interrogatories 24, 25).

At the trial appellant called Leland Weed, the Borough of Crafton's Building Inspector. Weed testified that it was he who had informed appellant that the pool violated the local ordinance. In addition, he was permitted to testify as an expert witness concerning customary practice in the construction industry. After establishing his qualifications (which included thirty-two years' experience in the construction industry), Weed testified:

Well, it certainly would indicate to the foreman or the supervisor when he arrived at the site with materials and men, not finding a placard or a permit sign having been issued, I would say in the practice of the trade,

it's—it charges him then with the duty of making some sort of an inquiry.

.    .    .    .    .    .    .    .

[E]ven under the conditions that have been stated in this Court, where it implies or indicates that the permit—where the permit is the responsibility of others, the erection crew, it seems to me—it is nothing more than common sense—either I have got a permit or somebody has got a permit before I start. (N.T. 26, 27).

Weed further testified that the building permits issued by the Borough of Crafton were yellow with black print on 8½″ by 14″ paper, and that a permit must be displayed either on a post or in a window on the front of the property (N.T. 29, 30.)

■ It is evident from these facts that appellee's method of conducting its business amounted to a deliberate refusal to know and to do what a responsible business engaged in the construction industry should know and do. To some extent the trial judge and the court *en banc* seem to have recognized the irresponsibility of appellee's conduct, for no damages for loss of profit were awarded. *Cf.* Uniform Commercial Code, *supra* § 2–708 (2), 12A P.S. § 2–708(2). Such recognition, however, did not go far enough; substantially all of the damages claimed by appellee were foreseeable and avoidable. Appellee is at most entitled to recover $50, representing the actual cost of transporting the materials and work crew to the job site (N.T. 13). Since appellee was not justified in erecting the pool, appellant's expenditure of $30 to dismantle the pool (N.T. 40) must be offset against this $50.[8]

The judgment entered against appellant in the amount of $2,398.00 at No. 1041 January Term 1973 is reversed,

8. We note that the pool is presently in appellant's basement, *see* page 1 *supra,* and presumably will be returned to appellee at its request.

and the record is remanded with directions to enter a judgment in appellee's favor in the amount of $20.

VAN der VOORT, J., concurs in the result.

CERCONE, J., files a dissenting opinion in which HOFFMAN, J., joins.

CERCONE, Judge (dissenting).

I disagree with the majority's conclusion that the written agreement between Contractor Industries and Mrs. Zerr to construct a pool on her property effectively placed the burden of securing a building permit on Mrs. Zerr. Since Contractor Industries did not, and could not, perform its obligations under the contract, I conclude that they did not perfect a cause of action against Mrs. Zerr. Hence, plaintiff's judgment should be reversed rather than reduced. I submit that the proper result in this case is reached by more thorough examination of appellant's argument that, the written agreement notwithstanding, Contractor Industries was obliged to take the steps necessary to securing a building permit.[1] Although this requires us to interpret the words, "Customer supplies permit," rather rigorously against Contractor Industries, under the facts of the instant case I find such a strict interpretation to be warranted. On the other hand, this course does have the advantage of avoiding a dubious application of the concept of mitigation of damages which, as employed by the majority, leaves unexplained why Contractor Industries may not recover its out-of-pocket expenditure in purchasing the swimming pool for Mrs. Zerr from the wholesaler.[2]

1. Appellant raised this argument to rebut the assertion that she was primarily at fault for the illegal construction of the pool on her property.

2. There is absolutely no evidence that Contractor Industries could have resold the swimming pool to another customer, yet the majority denies recovery for the expense of purchasing the pool despite the fact that the burden of showing such an opportunity to

First, it should be obvious that no reasonable interpretation of the phrase, "Customer supplies permit" would lead to the conclusion that either party assumed the risk that Crafton Borough might have an ordinance which made performance of the contract impossible. Hence, the non-existence of a proscription against front-yard swimming pools in Crafton Borough can only reasonably be construed as a condition,[3] so that the duties of full performance under the contract should have been treated as discharged. See Murray on Contracts § 201 (1974). On the other hand, it would not be unreasonable for the contract to place the obligation to use best efforts to secure the requisite permit on one of the parties, or to allocate the cost of obtaining such a permit to the buyer. For the following reasons, I have concluded that while the cost of securing a permit may have been an expense for which Mrs. Zerr would have had to have paid, the contract did not require that Mrs. Zerr take the steps prerequisite to obtaining the permit. Procuring the permit, if possible, was Contractor Industries' obligation, so that it must bear the consequential damages flowing from its failure to inquire about the borough's regulations.

The important concept in interpretation of any contract is the objective manifestation of assent. Restatement, 2d § 2, Comment b (1973). The subjective meaning attached by either party to a form of words is not controlling on the scope of the agreement between the parties unless one party knows or has reason to know of a particular meaning attached by the party manifesting assent. Restatement of Contracts, Second § 226, Comment b. (Rev.Tent.Draft No. 107, 1973). Hence, while Mrs. Zerr indisputably took a substantial risk in not

mitigate rested with the defendant, Mrs. Zerr. See, e. g., D. Dobbs, Remedies § 3.7 at p. 189 (1973).

**3.** 3A Corbin on Contracts §§ 632–33 (1960); Restatement of Contracts, 2d § 251, Comment d (Rev.Tent.Draft Nos. 1–7, 1973). [Hereinafter Restatement, 2d (1973)].

reading the written agreement, her failure to read the agreement does not make her susceptible to that interpretation Contractor Industries now prefers to attach to the words, "Customer supplies permit." In other words, the *objective* manifestations of assent still control in determining the relative rights and duties of the parties. Although the use of greater specificity may have obtained the protection Contractor Industries now seeks, the language chosen did not unambiguously define the duties of the parties with respect to obtaining a permit, no more than it expressed whether the ability to obtain a permit was a condition or a promise.

Ordinarily, the obligation to procure a permit to build naturally and normally should fall on the builder, especially with respect to home improvements. His superior knowledge and expertise in all aspects of building, including its legal aspects, is the skill which he sells. In the ordinary case, if a builder's failure to get a permit prevents his timely completion of performance, it would be fair to say that he, rather than the property owner, is in breach. A home improvement buyer, in contrast, may not even know that a building permit is necessary, nor know the government agency from which it may be obtained. Thus, it is not surprising that the borough ordinance involved in the instant case placed the burden of obtaining the permit on the builder, Contractor Industries; and, it was Contractor Industries which the borough fined and ordered to remove the pool.[4] Hence, the circumstances of this type of case, and the language of the ordinance involved herein, demonstrate that when the parties do not provide to the contrary, the builder should be required to obtain the permit. Because he may be reasonably expected to know that the buyer is relying upon him to do so, his failure to obtain

---

4. Mrs. Zerr dismantled the pool at the borough's request when Contractor Industries appealed the fine and refused to remove the pool.

a permit through a lack of diligence should be construed as a breach. In similar situations involving the sale of goods, the Uniform Commercial Code, Section 2–315[5] imposes such an obligation on a seller by use of the implied warranty of fitness for a particular purpose.[6] While such implied warranties of fitness may be excluded under Section 2–316 of the Code by general language, such language should be apt for the purpose and call the buyer's attention to the fact that certain benefits which he reasonably expects to receive are being excluded. See J. White & R. Summers, Uniform Commercial Code § 12–5 (1972). See also *Fogel Refrigerator Co. v. Oteri*, 10 D. & C.2d 511. Analogously, in non-Code cases, if one possessing expertise wishes to delegate responsibility under a contract for an aspect of performance with respect to which he has reason to know the other party is relying upon his skill and judgment, he must do so unambiguously. Therefore, if the instant language, "Customer supplies permit" is ambiguous, the obligation to take the necessary steps to secure a permit was not effectively shifted to Mrs. Zerr; and, Contractor Industries' assembly of the pool without a permit was a breach.

The law universally recognizes the principle that the language of a contract must be construed strictly against the party responsible for it. 8 P.L.E., *Contracts* § 146 (1971). This general principle is even more forcefully applied when the contract is reduced to writing by a party possessing special knowledge with respect to the subject matter of the contract. *Mowry v. McWherter*, 365

---

5. Act of April 6, 1953, P.L. 3, § 2–315, 12A P.S. § 2–315 (1970).

6. Although neither party has argued that the applicable law in the instant case is embodied in the Uniform Commercial Code, 12A P.S. § 1–101 *et seq.* (1970), presumably because they conceived the swimming pool to be a "fixture" of the type to which the Code does not apply, [But see U.C.C., 12A P.S. § 2–105(1) (1970)], the Code is persuasive authority in the field of contract law in general. See, e. g., *Elderkin v. Gaster*, 447 Pa. 118, 288 A.2d 771 (1973); *Hoffman v. Misericordia Hospital of Phila.*, 439 Pa. 501, 267 A.2d 867 (1970).

Pa. 232, 74 A.2d 154 (1950). See also Murray on Contracts § 119 (1974). In determining whether an ambiguity exists, the court may consider whether more precise language would have put the matter beyond reasonable question. *Celley v. Mutual Benefit Health & Acc. Ins.*, 229 Pa.Super. 475, 482, 324 A.2d 430 (1974). As the Restatement, 2d § 232 provides:

> "In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."

The meaning which Mrs. Zerr attaches to the language, "Customer supplies permit," is that she would have to pay the costs of procuring the permit, not that she would actually have to procure it herself. This interpretation is not unreasonable given the fact of Contractor Industries' aforementioned superior knowledge, and the fact that the ordinance places the burden of obtaining a permit on the builder. But, Mrs. Zerr's interpretation becomes all the more persuasive when the intended course of performance, revealed in the interrogatories, is considered. See Uniform Commercial Code § 2–208(1); Murray on Contracts § 123 (1974). The contract also stated, "Customer supplies electrical." However, Contractor Industries admitted that this did not mean that Mrs. Zerr would have to literally provide the electrical wiring, etc., necessary for running a water pump and filter; it apparently only meant that the costs of the necessary electrical work, *to be done by Contractor Industries*, were not necessarily contemplated as part of the contract price. Obviously, the necessary electrical work was another aspect of the contract concerning which Contractor Industries had special skill and expertise, and they admitted that "Customer supplies electrical" was not intended to be literally construed. Since that is the case, Mrs. Zerr was entitled to presume that

"Customer supplies permit" was also not to be literally construed.

Although the meaning attributed to "Customer supplies permit" by either party is reasonable, the aforementioned sound principles of interpretation and construction persuade that Mrs. Zerr's interpretation must prevail. As Mrs. Zerr testified, when she agreed to purchase the pool from Contractor Industries, it was her understanding that Contractor Industries would take care of everything, leaving her only to pay the contract price. Since Contractor Industries was the expert in this field, Mrs. Zerr's expectation was manifestly reasonable. Hence, Contractor Industries breached the contract when it failed to use its best efforts to obtain a building permit, and it may not recover either its out-of-pocket expenses or lost profits herein. On the other hand, since Mrs. Zerr apparently only pleaded her expenses in dismantling the pool as a set-off, she cannot recover those expenses either. Therefore, I would reverse the judgment entered for Contractor Industries, and order that judgment be entered for defendant, Mrs. Zerr.

HOFFMAN, J., joins in this dissenting opinion.