**In re Athanassios KONIDARIS, Debtor.**

**Bankruptcy No. 82–05844S.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 20, 1988.

Richard M. Tiger, Philadelphia, Pa., for claimant.

Lawrence J. Tabas, Philadelphia, Pa., for trustee.

John Snavely, Drexel Hill, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This long-standing dispute over a Proof of Claim filed by one Deborah Mintert (hereinafter referred to as "the Claimant") against the estate of the instant Chapter 7 Debtor raises several provocative issues of both bankruptcy law and state law in a unusual factual setting. We conclude that the Claimant is entitled to claims for wages earned while working in a corporate restaurant of which the Debtor was the principal in the amount of $3,861.12 under 11 U.S.C. §§ 507(a)(1), 503(b)(1)(A) (administrative claim); $2,000.00 under 11 U.S.C. § 507(a)(3) (pre-petition wage claim); and $3,313.04 as an unsecured claim. We also hold that she is entitled to an unsecured claim of $1,000.00 for a loan made to the restaurant evidenced by a note signed by the Debtor.

This bankruptcy case was filed under Chapter 11 of the Bankruptcy Code on December 6, 1982. At the time of the filing, the Debtor was operating a business known as the Onassis Greek Restaurant (hereinafter referred to as "the Onassis") at 1735 Sansom Street, Philadelphia, Pennsylvania. This business was a fictitious name of a corporation formed by the Debtor named, picturesquely for a corporation operating a Greek restaurant, Famous England Pizza and Deli, Inc. (referred to hereinafter as "the Corporation"). The business apparently limped along in Chapter 11 until July, 1983, when it closed its doors. On May 24, 1983, the Commonwealth of Pennsylvania moved for the appointment of a trustee or conversion of the case to Chapter 7. The motion was joined by another creditor, Bank Leumi Le–Israel, on July 12, 1983, about the date of the closing of the business. The Clerk of this court thereafter filed a separate motion to convert the case to Chapter 7 when the Debtor failed to file monthly operating statements. On November 4, 1983, after a hearing at which there was no appearance, the case was converted to Chapter 7, and Harry B. Altenberg was appointed as trustee.

The Debtor was ultimately discharged on August 19, 1986, shortly before our appointment to the bench. However, assets of about $70,000.00 remained in the estate. The trustee thereafter launched several Objections to Proofs of Claims. One claim to which the trustee did not object was that filed by the instant Claimant, pro se, on July 6, 1983, in the amount of $10,000.00 for wages allegedly earned between July, 1981, and July 6, 1983. On July 30, 1987, the Debtor therefore proceeded to file an Objection to this claim, contending that the true sole obligor of the claims in issue was the Corporation and not the individual Debtor.

On October 1, 1987, this matter came before us for a hearing. After about two hours of testimony from the Debtor, the Claimant, and two witnesses on behalf of the latter, we engaged counsel for the opposing parties and the trustee in a discussion regarding the status of administration of the estate. We believed that the status of the assets and claims against the estate could possibly render the significance of classification of the Claimant's claims moot. After this colloquy, we entered an Order of October 2, 1987, directing the trustee to file and serve a status report on or before October 13, 1987, and the parties to thereafter file and serve briefs in support of their respective positions simultaneously on November 2, 1987.

Our hopes for a swift, comprehensive resolution of this matter and administration of this case were not realized. Preparation of the trustee's report was delayed and then, when it was initially filed, its contents were disputed by the Debtor. The final report was not filed until December 1, 1987. It included a statement by the trustee that he intended to file additional Objections to other Proofs of Claim. On December 8, 1987, we ordered that these be filed by December 31, 1987, and heard on February 3, 1988, at which time a briefing schedule to resolve the instant claim would be established.

As it developed, however, due to continuances of the hearings on several of the latter Objections, most notably those of several Commonwealth agencies, they were not all resolved until April 18, 1988. Since it developed that the resolution of these matters did not moot the significance of resolution of the instant claim, we issued a further Order of April 18, 1988, directing the Debtor and the Claimant to file briefs on May 9, 1988, and May 23, 1988, respectively. Unfortunately, the Debtor's counsel claimed to have never received that Order, requiring us to push the briefing process back once again. Finally, as of June 10, 1988, we had in hand briefs of both parties. We do note that many of the numerous pertinent issues are covered superficially or not at all by either of these briefs, despite their lengthy gestation period.

We know of no authority requiring us to follow the generally tedious procedural format of producing specific Findings of Fact and Conclusions of Law in deciding Objections to Proofs of Claims. *Compare* Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a) (decisions in adversary proceedings must be presented in that format); and *In re Campfire Shop*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987) (decisions of motions need not be presented in that format). We therefore are preparing our decision in narrative form.

We begin by making several general observations regarding relative credibility of the witnesses. We found the Debtor generally unreliable in his recitations. Most notably, he initially attempted to dispute the fact that the Claimant was owed any wages at all by either the Onasses, the Corporation, or him personally. His present Brief, conceding a $2,000.00 priority claim and a $6,892.00 unsecured claim, bespeaks to his own present perception of his initial inaccuracy. His explanations of his dealings with the Claimant during the trial were couched in generalities, either due to lack of recollection of the specifics or evasiveness. The Claimant, a college graduate who has been rather dramatically underemployed, was very specific and accurate in her recollections, which were supported by copious documentation, and was therefore generally far more credible than the Debtor. Frances Saunders, one of the

Debtor's witnesses, was very clear in her recollections, totally disinterested, and hence entirely credible. The testimony of the Debtor's other witness, her boyfriend, Luciano Cetroni, was superfluous.

The Claimant began her employment at the Onassis as a waitress in January, 1979. The Debtor at all times during the parties' employment relationship and at the hearing identified himself as the owner of the Onassis. Actually, the Onassis was a fictitious name of the Corporation, and hence was owned by it. At one time the Debtor had apparently operated a business in the name of the Corporation in northeast Philadelphia and he continued to use that corporate name and its liquor license in operating the Onassis. In late 1979, Ms. Saunders was hired as the manager of the Onassis.

Although the relationship between the Debtor and the Claimant was apparently strictly one of business, there was a "family" type friendliness between them. Therefore, when the Debtor experienced financial problems in 1981, the Claimant was willing to make two interest-free loans of $1,000.00 each to the Onassis. These were memorialized by two notes, handwritten by Ms. Saunders, and dated June 19, 1981, and July 13, 1981, which read identically as follows:

Received from
   Miss Deborah Mintert
the sum of $1,000.00 for business loan on 6/29/81 [7/13/81] for Onassis Restaurant.

/s/ Athanassios Konidaris  /s/ Frances Saunders
                     Onassis
          /s/ Deborah Mintert

In addition, the loans were memorialized by the following note of July 13, 1981, on Onassis stationery:

To Whom It May Concern,
Miss Deborah Mintert has given the Onassis Greek Restaurant several loans, one of $1,000.00 dollars on the date of June 29th, the second on the date of July 13th for the amount of $1,000.00 dollars. Also Miss Mintert has allowed the restaurant the use of her pay since 6/17/81. To this date she has received no pay. This transaction was strictly a business loan. To keep Onassis operating smoothly.

/s/ F.N.S.  /s/ Athanassios Konidaris  /s/ Deborah Mintert

Neither of the parties gave a clear recitation of the supplemental oral statements made by the Debtor to the Claimant at the time of execution of these documents. However, Ms. Saunders testified that the Debtor stated that "he would see to it that you get your money back" and that he "personally guaranteed that you will get your money." It is undisputed that only $1,000.00 has in fact ever been repaid.

Beginning with the week of March 21, 1982, the Claimant agreed to provide further financial assistance to the Onassis. She agreed that payment of her weekly salary of $100.00 gross and $77.84 net, after deductions including withholding taxes which the Onassis presumably paid, could be temporarily and indefinitely suspended. In addition, the Debtor agreed that the Claimant would be compensated an additional weekly sum of $100.00 cash, which would not be reported to the taxing authorities and from which no deductions would be taken, but concerning which payment was likewise suspended. The checks were drawn for the regular salary (that portion of wages from which the deductions were taken), but they were not cashed by the Claimant. The Claimant indicated that she agreed to this arrangement upon the Debtor's assurance that he owned the realty in which the Onassis was situated and that it could be sold at any time to make up the payments missed. The Claimant did, however, continue to receive compensation from her tips, which she claimed that she did report to the taxing authorities.

Despite this rather extraordinary financial assistance from the Claimant, the Onassis nevertheless continued to experience financial difficulties. On New Year's Eve, 1982, shortly after the bankruptcy filing on December 6, 1982, Ms. Saunders resigned, and the Claimant became the manager, at the same rate of compensation (or lack thereof) as before. This arrangement continued until the week of April 10, 1983. At that time, the Claimant left the Onassis as a regular employee, and continued to work only on two weekend nights per week, for which she would have been paid $50.00 weekly, but which compensation was also suspended. After twelve weeks, into July, 1983, the Onassis closed and this arrangement ceased. No payments for the wages earned but not paid to the Claimant were ever made. The Claimant retained the ledgers and uncashed

checks drawn by the Onassis to establish the documentation of her claims, and these were offered and admitted into evidence at the trial.

■ The starting point for our decision-making process is discussion of the pertinent bankruptcy-law principles. The first pertains to the relative burdens of proof of the claimant and objector in resolving an Objection to a Proof of Claim. Although we expressed some uncertainty on this issue at the time of the trial on October 1, 1987, we subsequently issued an Opinion in which we attempted to set down the controlling procedural principles in readily-comprehensible and practical fashion in *In re Lewis*, 80 B.R. 39, 40–41 (Bankr.E.D.Pa. 1987). Clearly, we are herein presented with Scenario 5 referenced therein, as both parties appeared and presented considerable evidence at a hotly-contested hearing. The Claimant therefore had the burden of proving the validity of her claim by a preponderance of the evidence. *Accord, In re Distrigas Corp.*, 75 B.R. 770, 772–73 (Bankr.D.Mass.1987). However, we note that the Claimant produced clear and convincing testimonial and documentary evidence to support all of her factual assertions.

■ The second significant issue is the treatment of wage claims in bankruptcy. There are two priority categories into which wages may fall. Wages for post-petition services may be entitled to a first priority, as "administrative expenses allowed under section 503(b) of this title," pursuant to 11 U.S.C. § 507(a)(1). Section 503(b) expressly includes "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A).

Secondly, wages for services rendered prepetition, but unpaid, are entitled to a third priority under 11 U.S.C. § 507(a)(3), which provides as follows:

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual.

Clearly, wage claims can be made for different periods under both 11 U.S.C. §§ 507(a)(1) and (a)(3). Typically, non-insider employees are not inclined, as was the Claimant here, to work both before and after bankruptcy for an extended period without receiving pay and only upon, in effect, the credit of their employer. Thus, usually wage-earner-creditors have been relegated to arguments that the *same* period for wages or benefits are classifiable under, alternatively, *either* § 507(a)(1) *or* § 507(a)(3). *Cf. In re Crouthamel Potato Chip Co.*, 52 B.R. 960, 967 n. 5 (E.D.Pa. 1985), *rev'd on other grounds*, 786 F.2d 141 (3d Cir.1986); and *In re Chicago Lutheran Hospital Ass'n*, 75 B.R. 854, 856–57 (Bankr.N.D.Ill.1987). However, in this unique factual setting, we see no reason why the Claimant here cannot claim under both priority categories for different time-periods. We note that the normal, restrictive interpretation of the scope of administrative claims, *see In re American International Airways, Inc.*, 77 B.R. 490, 494–95 (Bankr.E.D.Pa.1987); and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897 (Bankr.E.D.Pa.1987), does not apply to the Congressionally-favored category of wage claims. *In re Davidson Transfer & Storage Co.*, 41 B.R. 805, 807–08 (Bankr.D.Md.1984).

■ The Debtor, in his Brief, makes two spurious arguments which can be easily resolved under bankruptcy law. First, he suggests that the "key date" from which to measure whether wages are post-petition for purposes of § 507(a)(1) and from which to measure the 90–day period for purposes of § 507(a)(3) is November 4, 1983, the date that the case was converted to Chapter 7, rather than December 6, 1982, the date of the filing of the petition. However, the significant date of measurement for purposes of § 507(a)(1) is whether services are

rendered "after the commencement of the case," pursuant to § 503(b)(1)(A), and the significant date of measurement for purposes of § 507(a)(3) is "the date of the filing of the petition." § 507(a)(3)(A). "Conversion of a case from a case under one chapter of this title to a case under another chapter of this title ... does not effect a change in the date of the filing of the petition, [or] the commencement of the case, ..." 11 U.S.C. § 348(a). Thus, "conversion of the case ... does not alter the fact that the date of filing is the significant date for valuation of claims." *In re Mays, Mays v. United States,* 85 B.R. 955, 962 (Bankr.E.D.Pa.1988). Therefore, the date to which the status of the Claimant's wage claims must be referenced is the date that the petition was filed on December 6, 1982, not the date of conversion, November 4, 1983.

■ The Debtor also argues that it is significant that the agreement to pay the Claimant the extra, unreported $100.00 weekly was an executory contract which could have been rejected by the Debtor. However, as the Debtor concedes, he desired and therefore allowed the Claimant to totally perform the contract and thus received the full benefit of her services. A debtor must compensate the non-debtor party to an executory contract for benefits which he has already received. *See In re Metro Transportation Co.,* 87 B.R. 338, 343 (Bankr.E.D.Pa.1988); *In re Yonkers Hamilton Sanitarium,* 22 B.R. 427, 435 (Bankr.S.D.N.Y.1982); and *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 279–80 (Bankr.S.D.N.Y.1980). Ironically, the only case cited by the Debtor in his entire brief, *In re Packer Avenue Associates,* 1 B.R. 286, 292–95 (Bankr.E.D.Pa.1979), as even the Debtor appears to concede, supports the conclusion that any attempt to reject the executory contract now is barred by ratification and/or the failure of the Debtor or the trustee to act to reject it in timely fashion.

Therefore, we conclude that bankruptcy law principles support the conclusion that the Claimant is entitled to a first priority claim as to all unpaid wages earned after December 6, 1982, and a third priority claim as to all unpaid wages earned between September 7, 1982, and December 6, 1982. We must, however, turn to state law to resolve the two remaining issues relating to the Claimant's wage claims: (1) Is the Debtor, as opposed to the Corporation, liable for the Claimant's wage claims? and (2) Does the fact that the parties agreed that the $100.00 extra payment to the Claimant would be made without deducting the requisite withholding taxes, i.e., "under the table," taint at least that part of the claim on the ground that it constituted an illegal contract?

■ The evidence at the hearing presented a relatively close question regarding the liability of the Debtor personally for the wage claims of the Onassis. Clearly, the Corporation was the actual employer of the Claimant, not the Debtor. It is doubtful that sufficient facts were presented by the Claimant to justify our estopping the Debtor from denying that the Corporation, and not he individually, was the employer of the Claimant and hence primarily liable for her wages. We therefore conclude that the wage obligations were primarily those of the Corporation rather than those of the Debtor.

However, as the Claimant points out, our inquiry regarding the validity of her wage claims is not ended by our reaching this conclusion, due to the presence of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, et seq., as amended (hereinafter referred to as "the Law"). The term "employer" is defined in the Law at 43 P.S. § 260.2a as follows:

"Employer." Includes every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth.

This definition would certainly appear to include the Debtor, as the self-proclaimed owner of the Corporation, as well as the Corporation itself.

The term "wages" is also broadly defined in the same section of the Law to include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation." This definition would certainly appear to include all of the wage claims made by the Claimant here.

The further provisions of the Law provide a broad right to an employee to bring an action to recover unpaid wages against any "employer" in any court of competent jurisdiction. 43 P.S. § 260.9a(b).

The Law has frequently been used to render corporate officers personally liable for unpaid wages in the manner in which the Claimant here seeks to hold the Debtor personally liable for her wages. *See, e.g., Carpenters Health & Welfare Fund, etc. v. Kenneth A. Ambrose, Inc.*, 727 F.2d 279, 282–83 (3d Cir.1983); *Central Pennsylvania Teamsters Pension Fund v. Burten*, 634 F.Supp. 128, 131 (E.D.Pa.1986); *Amalgamated Cotton Garment & Allied Industries Fund v. J.B.C. Co. of Madera, Inc.*, 608 F.Supp. 158, 167–68 (W.D.Pa.1984); *Laborers Combined Funds of Western Pennsylvania v. Mattei*, 359 Pa.Super. 399, 406–07, 518 A.2d 1296, 1300–01 (1986); *Amalgamated Cotton Garment & Allied Industries Fund v. Dion*, 341 Pa.Super. 12, 15–17, 491 A.2d 123, 124–25 (1985); and *Ward v. Whalen*, 18 Pa.D. & C.3d 710, 711–14 (Alleg.Co.C.P.1982). Further, the argument invoked by the Claimant has been successfully raised in other bankruptcy cases. *See District 2, United Mine Workers v. Hinks*, 67 B.R. 883, 886–87 (Bankr.W.D.Pa.1986); and *In re Johnston*, 24 B.R. 685, 686–88 (Bankr.W.D.Pa.1982).

■ There is only one difficult issue concerning the application of the Law here, which we believe that the Debtor has waived by not raising it. That is whether the Law has been pre-empted by pertinent federal law and hence is unenforceable. *See McMahon v. McDowell*, 794 F.2d 100, 107–08 (3d Cir.1986); *Combs v. Indyk*, 554 F.Supp. 573, 574–75 (W.D.Pa.1982); and *In re Futura Industries, Inc.*, 69 B.R. 831, 836 (Bankr.E.D.Pa.1987). We note that, in *District 2, supra*, our colleague in Pitts-

burgh, Judge Markovitz, while recognizing the difficulty of the issue, concluded that, despite the presence of *McMahon*, he was bound to follow the statement that the Law was not pre-empted in *Ambrose*, 727 F.2d at 282 n. 5, until this holding was specifically overruled. 67 B.R. at 887. *Cf. Laborers Combined Funds, supra* (post-*McMahon* decision fails to address pre-emption issue). In any event, but for the presence of the Law, we may well have pierced the Corporation's veil and rendered the Debtor liable on that basis. *See In re BDW Associates, Inc.*, 75 B.R. 909, 911–14 (Bankr.W.D.Pa. 1987).

We therefore hold that the Claimant is entitled to assert her wage claim against the Debtor individually. Indeed, the Debtor appears to concede this point in his brief.

■ By way of contrast, the Debtor continues to press his contention that "whether or not" the contract to pay the extra $100.00 weekly "can be considered an enforceable verbal contract for wages given its 'under the table' character," Memorandum in Support of Debtor's Objection to Claim of Deborah Mintert, at 3, is a viable defense to the claim. However, we note that the contract between the Debtor and the Claimant does not require enforcement of the illegal, tax-evasive aspects of it to be enforceable. See page 854 *infra.* Thus, the illegal aspects of the contract should not render it unenforceable because, in such a context, the argument that a contract cannot be enforced due to illegality is unavailing. *Compare Wright v. Pipe Line Co.*, 101 Pa. 204, 207–08 (1882). *See also* 17 AM.JUR.2d 511–12 (1964).

Several other maxims militate in favor of not allowing the Debtor to utilize a contention that the contract was illegal to escape liability to the Claimant. First, the underlying contract was not itself illegal. The parties entered into an employment contract, the nature of which, in itself, was not *malum in se* or illegal. *Compare Contractor Industries v. Zerr*, 241 Pa.Super. 92, 98–101, 359 A.2d 803, 806–07 (1976); 17 AM. JUR. 2d, *supra*, at 525–26. Secondly, a refusal to enforce the contract would create a windfall for the Debtor, who al-

ready has received complete performance of the Claimant's services, and thus unduly penalizing the less guilty party. *See* 17 AM.JUR. 2d, *supra*, at 605–08. Finally, the tax laws violated by an agreement to receive wages "under the table" are statutes designed merely for raising revenue rather than for protection of the public from dangerous or deleterious acts, and hence their violation should not invalidate the contract. *See O'Brien v. O'Brien Steel Construction Co.*, 440 Pa. 375, 379–80, 271 A.2d 254, 256 (1970); and 17 AM. JUR.2d, *supra*, at 528–29.

Therefore, we will not eliminate the Claimant's wage claim for the extra $100.00 weekly which she was promised on the ground that it included an aspect which encouraged tax evasion. This is because the Claimant will now be compelled to report this income on her tax returns, and will be personally liable herself to remit any amounts which should have been withheld from her pay by the Onassis.

■ In the period from March 21, 1982, to the date of filing, the Claimant seeks $77.84, her regular gross wages less deductions, plus the entire $100.00 weekly additional sum which she was to be paid. Since the deductions were apparently withheld and remitted to the taxing authorities by the Onassis as to the regular wages, it appears that the Claimant is not liable for taxes due in reference to same. However, we shall allow her the full sum of $100.00 weekly in addition, and it will be her responsibility to remit the amounts that should have been withheld to the appropriate taxing authorities in reference to these amounts. We therefore conclude that she is justified in asserting a claim for wages due of $177.84 for each of these weeks.

■ By our calculation, the period from March 21, 1982, through the last week before the Debtor's bankruptcy filing contains thirty-seven (37) weeks. However, it appears that no checks were drawn for the Claimant in the mid-summer weeks. In addition, the Claimant claims to have worked a total of only thirty-one (31) weeks in this period. We thus assume that she took a summer vacation in this period and we shall utilize the thirty-one (31) weeks claimed in our calculations. Thirteen of these weeks appear to fall in the period ninety days before filing. The total sum ($31 \times \$177.84$) is $5,513.04. The sum over the 13–week period ($13 \times \$177.84$) is $2,311.92. The Claimant's third-priority claim is limited, by 11 U.S.C. § 507(a)(3)(B), to $2,000.00. The balance of the pre-petition claim, or $3,313.04, is properly classified as unsecured.

■ All of the Claimant's post-petition earnings are allowable as an administrative claim. The period from the date of the bankruptcy filing through the second week in April, 1983, when the Claimant resigned her regular employment at the Onassis and limited her work to weekends, embraced, by our calculation, approximately eighteen weeks. We measure the wages for this period at $3,261.12 ($177.84 \times 18$). In the final 12–week period, the Claimant seeks $50.00 weekly, which again will be subject to her own payment of taxes and other deductions. We thus arrive at a total sum of $600.00 ($50.00 \times 12$). Therefore, we compute the total administrative or first priority claim of the Claimant at $3,261.12 plus $600.00, or $3,861.12.

■ The only matter which remains to be decided is whether the Debtor is personally liable on the unpaid $1,000.00 balance from the loans made on June 29, 1981, and July 13, 1981. The Claimant relies upon three cases which hold that, whenever an individual signs a note without expressly indicating that he is acting for a corporate body, he is individually liable. *Watters v. DeMilio*, 390 Pa. 155, 158–59, 134 A.2d 671, 674 (1957); *Thalheimer v. R. M. Luff Construction Co.*, 93 MONTG.CO.L.RPTR. 153, 154 (1970); and *P. S. Stauffer & Sons, Inc. v. Smith*, 93 MONTG.CO.L.RPTR. 62, 63–64 (1970).

However, in contrast to the reasoning of those cases, we believe that the resolution of this issue requires resort to the Uniform Commercial Code (hereinafter referred to as "UCC"), particularly 13 Pa. C.S.A. § 3403 thereof. *See Trenton Trust Co. v. Klausman*, 222 Pa.Super. 400, 403–05, 296

A.2d 275, 277–78 (1972); *Pollin v. Mindy Mfg. Co.*, 211 Pa.Super. 87, 90–93, 236 A.2d 542, 544–45 (1967); and *Bell v. Dornan*, 203 Pa.Super. 562, 566–67, 201 A.2d 324, 326 (1964). That UCC section provides as follows:

§ 3403. Signature by authorized representative

(a) General rule.—A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representations. No particular form of appointment is necessary to establish such authority.

(b) When authorized representative personally obligated.—An authorized representative who signs his own name to an instrument:

(1) is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity; and

(2) except as otherwise established between the immediate parties, is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity.

(c) Signature in representative capacity.—Except as otherwise established the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity.

Application of this Section of the UCC to the notes in issue, the text of which we set forth at page 850 *supra,* is therefore necessary to decide this issue. Initially, we note that 13 Pa. C.S.A. § 3403(b)(1) does not provide for personal liability under the instant facts, as the instrument does name the "person represented," i.e., the Onassis. However, the portion of 13 Pa. C.S.A. § 3403(b)(2) stating that the instrument must "show that the representative signed in a representative capacity," as defined by

§ 3403(c), creates definite problems for the Debtor. Ms. Saunders, placing the name of the Onassis under her signature, has signed in a "representative capacity." Had Ms. Saunders not done so, the Claimant might have been able to proceed against her individually as well as against the Debtor. However, the name of the Onassis was not placed before or after his signature by the Debtor. Therefore, he has *not* signed in a "representative capacity."

The Debtor is, however, by the terms of § 3403(b)(2), able to avoid personal liability if he can establish his representative capacity between the parties by parol evidence. *See, e.g., Trenton Trust, supra,* 222 Pa.Super. at 403–05, 296 A.2d at 277–78. However, here, the parol evidence points in the opposite direction. The most decisive testimony as to the oral representations and hence the understanding between the immediate parties comes from the mouth of a disinterested, reliable, and credible witness, Ms. Saunders, who stated, *inter alia,* that the Debtor "personally guaranteed" that the Claimant would be repaid. This statement is precisely consistent with the manner in which the Debtor signed the notes. His otherwise-superfluous signature appears to be included as a personal guarantee of the obligation of the Onassis created by the signature of Ms. Saunders.

We hence conclude that the Debtor is liable to the Claimant for the $1,000.00 sum borrowed from, and not repaid to, the Claimant. This claim is, of course, unsecured.

Therefore, we conclude that the Claimant is entitled to claims classified as follows:

| | |
|---|---|
| Administrative (first priority) | — $3,861.12 |
| Pre-petition wage claim (third priority) | — 2,000.00 |
| Unsecured | — 4,313.04 |

We will enter an Order consistent with these conclusions. In addition, we append to our Order the requirement that the trustee prepare and file the Final Audit papers in this case on or before August 1, 1988, and bring this case to a rapid conclusion, thus effecting prompt distribution of the considerable estate funds held by him,

by scheduling the Final Audit hearing on September 6, 1988.