Artie C. ESPENSHADE, Appellant,

v.

Constance M. ESPENSHADE, Appellee.

Superior Court of Pennsylvania.

Submitted March 1, 1999.
Filed May 6, 1999.

Elizabeth B. Stone, New Cumberland, for appellant.

Diane G. Radcliff, Camp Hill, for appellee.

Before McEWEN, President Judge, and OLSZEWSKI, and BECK, JJ.

OLSZEWSKI, J.:

¶ 1 Artie Espenshade ("Artie") appeals the order of the common pleas court entered July 2, 1998, holding him in contempt for failing to comply with the terms of his separation agreement with his ex-wife, Constance Espenshade ("Connie"). We affirm.

¶ 2 Artie and Connie were married on April 20, 1968. Artie adopted Connie's four children from a previous marriage, and they also had a child of their own. Artie, however, left the marital home in 1988 and initiated a divorce action on February 15, 1991, which was finalized on May 18, 1994. During the separation, Artie paid Connie $800 bi-weekly in support. A divorce agreement was entered on April 14, 1994, and incorporated into the divorce decree, which stipulated that Artie would provide Connie with alimony in the amount of $350 per week. The agreement provided, *inter alia*, that it was enforceable by petition for contempt. Artie apparently met his obligation satisfactorily.

¶ 3 In early February of 1996, Artie wished to buy a new home. Unfortunately, he found himself unable to obtain a mortgage because his debts outstripped his creditworthiness. He sought from Connie a "paper agreement" to reduce his amount of alimony to $600 per month; the reduction would enable him to present a more acceptable picture of debt "on paper" to his mortgagor and thus enable him to buy the home. But Artie assured Connie that he would nevertheless maintain the actual alimony payments at the agreed-upon level he had been paying, i.e., $700 every two weeks. Artie also told Connie that the agreement would be destroyed as soon as he obtained financing for his home.

Connie stated that she would be taking a big chance if she agreed, but ultimately she did agree and an addendum to the original agreement was signed February 1, 1996.[1]

¶ 4 Artie bought his home and, true to his word, continued paying Connie her alimony at the rate of $700 every two weeks. He sent Connie his copy of the addendum, which she destroyed.[2] By fall of 1996, however, Artie's alimony payments began arriving late and finally, on September 10, 1996, he informed Connie that he could no longer afford to pay her $700 bi-weekly and began sending her only $500 bi-weekly. Connie balked and protested to no avail until she filed the instant action on November 18, 1997, seeking enforcement of the original divorce agreement. At that point, Artie further reduced his alimony payments to $600 a month.

¶ 5 The trial court issued an order on November 24, 1997, to show cause why appellant should not be held in contempt for failing to comply with the terms of the original divorce agreement. An untran-scribed hearing was held on December 31, 1997, after which the trial court determined that the case was not ripe for adjudication and ordered appellant to file an answer raising his New Matter regarding the addendum. After a number of replies and answers, a hearing was held on April 27, 1998. The trial court subsequently entered an interim order on June 2, 1998, citing appellant for contempt of court for violating the April 14, 1994, divorce agreement. A further hearing was held July 2, 1998, after which a final order of contempt was entered, directing appellant to pay appellee the sum of $12,713 in back alimony, $2,868 in attorney's fees, and continue paying alimony in the amount of $700 bi-weekly. The present appeal followed.

¶ 6 Appellant raises five questions for our consideration:

1. Did the lower court err when it determined that an Addendum to a post-nuptial agreement, signed by the parties on February 1, 1996, was not a valid and enforceable contract?

1. Appellant recalls the conversation slightly differently: "I called Connie and I told her that I was attempting to buy a home, and that I could not buy the home without a reduction in alimony, that I needed a reduction in alimony." N.T., 4/27/98, at 73. He did allow that he told her he "would pay as much as I could, but at some point in time the amount would have to be reduced to a point where I could make my house payments." N.T., 4/27/99, at 78.

2. Appellant at first denied that he sent his copy of the addendum to appellee:

A: She asked me if I would send her a copy. I did not send her a copy of my addendum. My copy – she asked me specifically if I would send her my copy of the addendum, and I did not respond, and I did not send her my copy of the addendum.

Q: So if someone else saw a document come from you that had the addendum in it and your return address on it, had your signature on it, it would be your testimony that those people would be lying?

A: I do not recall sending Connie a copy –

Q: Now, before you said you didn't do it.

A: Actually –

Q: You said before you didn't do it. Now, did you not do it or you just don't remember doing it?

A: Let me think for just one second because I think you've prompted something. I believe her request was for her – for me to send her my copy of the addendum, and I may have made a copy of that and sent to her, but I did not send my original copy of the addendum.

Q: If a person saw a document that had your original signature on it that came in an envelope from you, that person would be lying?

A: I do not recall sending Connie my copy of the addendum. I may have sent her a copy, but I do not recall sending her or relinquishing my copy of the addendum.

Q: So it is your testimony here today that you never sent her one of the originals back?

A: My testimony here today is that I don't recall doing that. That's my testimony. N.T., 4/27/98, at 103–04. Christy Espenshade, the natural child of both parties, testified on rebuttal that she saw a copy of the addendum received by her mother in an envelope sent from her father, but could not say whether it was an original document. N.T. 4/27/98, at 111–12.

2. Did the lower court err when it permitted parol evidence to prove the intent of the parties when signing the February 1, 1996, Addendum?

3. Did the lower court err when it determined that the Addendum failed for lack of consideration?

4. Did the lower court err when it failed to consider that the parties later admitted to an oral agreement which reduced the alimony payments made by the wife which supported the acceptance of the addendum by the parties?

5. Did the lower court err when it violated public policy by interfering in the contractual agreement between two intimate parties, and where on its face, the contract and its intent are clear?

Appellant's brief, at 2. In ruling that the February 1, 1996, addendum was invalid, the trial court found that (1) the addendum did not represent a valid contract for which there was a manifestation of mutual assent by both parties to lower the alimony, and (2) the addendum was not supported by consideration. Trial court opinion, 6/2/98, at 8.

 ¶ 7 The gravamen of appellant's complaints one and two are that the trial court erred by looking beyond the "four corners" of the allegedly unambiguous addendum and incorrectly permitted parol evidence of prior agreements outside the plain meaning of the language of the addendum to discern the parties' intent. Appellant's brief, at 9–10, 14–16. We agree that, when the language describing the terms of a contract is unambiguous, the intent of the parties as set forth by the clear language is given effect. *Weisman v. Green Tree Ins. Co.*, 447 Pa.Super. 549, 670 A.2d 160, 161 (1996). We also note that a contract provision will not be considered ambiguous simply because the parties do not agree upon the proper construction. *Id.* That, however, is not the instant case. Here, the parties do not disagree on an interpretation of the language of the addendum. Instead, the parties disagree about the basic validity of the addendum, i.e., whether the addendum constitutes an enforceable agreement and whether the parties actually intended to be bound by the terms of the contract.

 ¶ 8 This action was initiated by appellee when she sought to enforce the terms of the April 14, 1994, divorce agreement. In response, appellant raised the issue of the addendum and asserted the affirmative defense that the original agreement had been modified. In response to appellant's affirmative defense, appellee asserted that the addendum was void *ab initio*, for reasons of lack of consideration, lack of intent to be bound, fraudulent inducement, rescission, undue influence, abandonment, lack of full and fair disclosure, and that the contract was entered into for an illegal purpose or a purpose in violation of public policy, i.e., in order to make false representations to appellant's mortgage company. Reply to Plaintiff/Respondent's New Matter, ¶¶ 14(a)–(h). The issues presented thus directly implicate the basic intent of the parties to enter into a binding agreement, which allegations go beyond issues that can be discerned from the text of the addendum. Therefore, extrinsic evidence regarding the parties' intent is necessary. "A party who seeks to strike down his solemn written obligation must present evidence which is clear, precise, and indubitable." *Schoble v. Schoble*, 349 Pa. 408, 37 A.2d 604, 605 (1944). We have previously held that:

Although a writing may appear to be complete on its face, parol evidence is admissible to vary the contents of the writing when there is proof that the writing does not reflect the true agreement of the parties. For example, if the terms of the contract are ambiguous, parol evidence may be introduced to aid in the interpretation of the agreement. . . . Likewise, if fraud, accident or mistake is alleged, extrinsic evidence is admissible to vary or contradict the terms of the written agreement.

*Northwest Savings Ass'n v. Distler*, 354 Pa.Super. 187, 511 A.2d 824, 826 (1986) (citations omitted). Similarly, "[a] con-

tract apparently valid upon its face may nevertheless be impeached for illegality as opposed to public policy by evidence aliunde." *Constructor's Ass'n of Western Pa. v. Furman*, 165 Pa.Super. 248, 67 A.2d 590, 592 (1949). The introduction of parol evidence to prove appellee's charges of fraud, illegality, etc, was thus proper.

¶ 9 "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Ingrassia Const. Co., Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 483 (1984). The evidence here, as accepted by the trial court sitting as fact-finder, clearly established that appellant manifested the intent to disregard the validity of the addendum. For instance, appellant returned the original addendum to appellee for destruction once he obtained the mortgage for his new home. Most telling, though, is the fact that appellant continued to pay Connie the $700 bi-weekly as provided for in the original agreement for a full seven months after the addendum was signed.

¶ 10 Appellant's testimony regarding the flow of events is quite conflicted and confused throughout. For example, on direct examination, appellant testified as follows:

Q: You also heard testimony with respect to an agreement for a reduction from the $700.00 bi-weekly to a lesser amount. Could you recite for the Court your recollection of that agreement?

A: Yes. I was paying $700.00 bi-weekly, and I had called Connie on several occasions and told her that it was very difficult for me to continue paying that amount, that, you know, that I needed to have, you know, living expenses also.

I had asked her if there was anyway possible that we could reduce that amount, and she asked me what I was suggesting. We had some conversation, and we agreed to a thousand dollars a month, that we would reduce the $700.00 bi-weekly to $1,000.00 a month.

I told her that I would call the lawyer and that I would have an agreement drawn up stating that I would only have to pay $1,000.00 a month. She specifically said to me, we don't have to get the lawyers involved, there is no reason to pay the lawyers any more money than we've already paid them, if you and I agree to a thousand dollars a month, that should be good enough. And at that point and time I continued to pay $1,000 a month up and to the new addendum.

Q: And that would be September 7 th was your first payment of $500.00 a month—$500.00 bi-weekly, is that correct?

A: Correct.

THE COURT: September 7 what?

MS. STONE (appellant's counsel): 1996. Is that correct, Mr. Espenshade?

THE WITNESS: I believe that's when the addendum was, yes.

THE COURT: Well, the addendum is February.

MS. STONE: I'm incorrect. Was it 1995?

THE WITNESS: Okay. I started paying the $500.00 from September of 1996 up to the date of the addendum.

BY MS. STONE: Q: That wouldn't be accurate, Mr. Espenshade. The addendum that is in front of you is dated February 1 st, 1996, is that correct?

A: Excuse me just one second. Yes, that's correct.

Q: So even after the addendum was signed you continued to send $700.00 every two weeks, is that correct?

A: Yes, I'm sorry, that's correct. I continued to send $700.00 a week after the addendum was signed up to September of 1996 when I started sending the $500.00 bi-weekly.

THE COURT: I am totally confused. He was working on before the addendum before.

THE WITNESS: I'm sorry.

THE COURT: You are going to have to start over again because I am thoroughly confused.

THE WITNESS: I'm sorry. I didn't mean to confuse anybody. I'm sorry.

THE COURT: I know you didn't. When did you agree to, in effect, the thousand dollars a month and when did you start paying that?

THE WITNESS: We agreed to the –

THE COURT: Let me ask it this way, before or after the addendum?

THE WITNESS: We agreed to the thousand dollars a month before the addendum.

THE COURT: Okay. And when did you make your first $500.00 bi-weekly payment?

THE WITNESS: I'm sorry, sir?

THE COURT: When did you make your first $500.00 bi-weekly payment?

THE WITNESS: My records are showing that I made the first $500.00 payment on September 7th of 1996.

BY MS. STONE: Q: So that's actually after the addendum was reached?

A: That's after the addendum.

Q: So you paid more than the addendum said you had to?

THE COURT: Wait a minute. So you moved right ahead here until after the addendum, you had not gotten to the addendum yet, you are ahead of yourself, right?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead.

N.T., 4/27/98, at 69–72. The clarity did not last, however:

Q: Now. Would you tell the court your recollection of the conversation whereby you and Connie reached an agreement to the reduction in alimony?

A: Yes. I called Connie and I told her that I was attempting to buy a home, and that I could not buy the home without a reduction in alimony, that I needed a reduction in alimony.

I specifically stated to her that we had had several conversations in the past, that I could not continue to pay her the amount that I was paying her, that it was extremely difficult to do so.

During our conversation, I told her that I had called – well, I needed a reduction in alimony and that in order to do that we needed an addendum to the original agreement. I stated the amount that I needed, which was $600.00.

Q: Let me stop you here. Was this all in one or two conversations, do you recall?

A: This was in one telephone conversation. I stated the amount that I needed, which was $600.00.

THE COURT: Six hundred dollars what?

THE WITNESS: Per month. Six hundred dollars per month. She asked – she said to me, she said that, you know, she goes, well – her question was, if we wanted to change this, how would we go about changing it? And I told her that there are two ways to change an addendum. Number one, to have a new addendum drawn up, or, number two, to discard the addendums. Her reply to me was that she was taking – if she did this, that she would be taking a big chance in doing this.

\* \* \* \* \* \*

Q: Now, this addendum was signed on February 1st, 1996, is that correct?

A: Correct.

Q: However, your payments reflect that you paid more than that?

A: That's correct.

Q: How long did you continue to pay more?

THE COURT: More being what?

THE WITNESS: I continued paying more than the addendum called for until –

MS. STONE: Stop right there.

THE COURT: How much more?

BY MS. STONE: Q: Isn't it true you sent $700.00 bi-weekly even after the addendum was signed?

A: Five hundred dollars bi-weekly.

Q: Look at your payment history here.

THE COURT: I am going to take a break. Get him squared away. You are obviously suggesting that his own records do not show what he says, and he is going back. I have got the dates completely screwed up. I want him to look at his records and then give me what his records show what date he paid them. It is critically important for him to say what he paid after the addendum. Recess.

*　　*　　*　　*　　*　　*

Q: In your conversations with Connie after February 1st, 1996, was she aware that you were only obligated to $600 a month?

A: She had a copy of the addendum.

Q: And did you tell her that you would stop paying the $700.00 every two weeks after a period of time?

A: Yes, I did.

Q: And that stopped on September 7th, 1996, is that correct?

A: September 7th, 1996, that's correct.

Q: And that's where the two of you reached the agreement to reduce it to a thousand dollars a month, is that correct?

A: That is correct.

Q: Was there ever a time where you sent double payments where you were only expected to send $600.00 after the agreement was signed and you sent only $600.00?

A: I started sending $600.00 a month on November 22nd of 1996.

Q: 1997?

A: 1997.

Q: And that's the first time that you actually followed the terms of the agreement, is that true?

A: Yes, it is.

Q: And was there a conversation around that time that led you to sending the $600.00 a month?

A: I told Connie that I was unable to continue to send her money in excess of the amount that I was legally obligated to send, that I was financially unable to do so, and at that point in time I started sending what the addendum called for.[3]

N.T., 4/27/98, at 73–74, 76–77, 78–80.

■ ¶ 11 Even when he sought to reduce his obligation, appellant did not invoke the terms of the addendum, but rather, he alleges that he sought either (1) to re-negotiate the terms of the original agreement to a new alimony amount higher than that provided for in the already-existing addendum, or (2) to invoke the terms of a pre-addendum oral agreement providing for a level of alimony in excess of that provided for in the addendum.[4]

3. We note that, coincidentally, appellee filed suit seeking enforcement of the original agreement on November 18, 1997, and served it on appellant through his attorney on November 24, 1997.

4. Wading through the confusion of appellant's guided testimony, he suggests either one of two scenarios. The first is that he and his ex-wife negotiated an oral agreement to reduce his alimony payments to $500 bi-weekly sometime before February 1996, but that despite his urgency in getting her agreement, he continued paying $700 bi-weekly. Then, when he wanted to buy a house, they negotiated a written agreement to reduce the alimony to $600 a month. He again continued to pay at the rate of $700 bi-weekly, however, until such time as he needed extra money to meet his mortgage payments, when he then invoked the terms of the oral agreement. It was not until appellee sued to enforce the original agreement that appellant invoked the terms of the written agreement. Alternatively, appellant suggests that he and his ex-wife entered into a written agreement to reduce his alimony obligation from $700 bi-weekly to $600 a month, but that he continued to pay $700 bi-weekly for another seven months. At that point, he felt the financial pinch of his new home and negotiated an oral agreement with his ex-wife to reduce the alimony to $500 bi-weekly. He adhered to this oral agreement for another year, invoking the written one

Under either scenario, the terms of the addendum were to be ignored. It was not until appellee sought enforcement of the original agreement that appellant trotted out the addendum and sought to rely on it in his defense, nearly twenty-two months after the addendum was executed. All these facts demonstrate that appellant considered the addendum to have no legal effect, and the trial court did not err by finding that this was the manifested intent of the parties.

¶ 12 More disturbing to this Court, however, is the fact that appellee's allegation of illegal purpose remained unaddressed. The trial court found as a matter of fact that "the sole purpose of the addendum dated February 1, 1996, was to enable husband to secure a mortgage to finance the purchase of a new home." Trial court opinion, 6/2/98, at 6–7. We have previously held that a contract is unenforceable if its formation or performance is "criminal, tortious or otherwise opposed to public policy." *Contractor Industries v. Zerr*, 241 Pa.Super. 92, 359 A.2d 803, 805 (1976). Simply put, appellant needed the addendum "on paper" to misrepresent to his mortgage company that his overall debt was lower than it actually was. In other words, the sole purpose of the addendum was to defraud a lender. We believe that such a tortious purpose would, in and of itself, be sufficient to render the addendum void and unenforceable; and we would affirm on these grounds were the trial court's decision not otherwise valid.[5]

¶ 13 Appellant also claims in his third question that the trial court erred by find-

only after Connie filed suit for enforcement of the original agreement.

It is readily apparent that the trial court, in rendering its decision, found neither of appellant's scenarios credible. We concur, even though we recognize that it is not ordinarily the role of the appellate court to determine the credibility of witnesses. *Denes v. Pennsylvania Turnpike Com'n*, 547 Pa. 152, 689 A.2d 219, 222 (1997). We recount the foregoing testimony as the basis for the facts set forth in our opinion, but we also note that for the trial court to reach a different conclusion would likely constitute a reversible abuse of discre-

ing the addendum unenforceable because of a want of consideration. Appellant relies principally on our Supreme Court's ruling in *Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975), for support of the proposition that, "as long as the clause states that the parties intended to be legally bound by the agreement, the absence of consideration [does] not render [an] agreement unenforceable." Appellant's brief, at 17. Appellant's argument is attractive, in that we have supported this doctrine in the past in *Laudig v. Laudig*, 425 Pa.Super. 228, 624 A.2d 651 (1993). There, we held that a postnuptial agreement that lacked consideration was valid by operation of 33 P.S. § 6, in that the language of the agreement expressly stated that the parties intended to be legally bound. The addendum contested instantly also contained such language. However, as we have already found the contract void for want of intent to be bound and illegality, the language contained in the addendum does not alter the true intent of the parties, and thus does not provide appellant relief.

¶ 14 Appellant also makes a spurious assertion in his fourth question, stating that the trial court ignored testimony offered by both parties as to an agreement to reduce the alimony payments to $500 bi-weekly. Appellant characterizes Connie's testimony as acceding that she orally agreed to reduce her demand for alimony. Our review of the testimony on direct examination shows a different story:

Q: Now, you've indicated on that exhibit that on September 10th, 1996,

tion. *Commonwealth v. Powell*, 527 Pa. 288, 590 A.2d 1240, 1244 n. 8 (1991) (holding that abuse of discretion "means the clearly erroneous conclusion and judgment – one [that is] clearly against logic and effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing. . . .").

5. We may affirm on grounds other than those relied upon by the trial court. *Commonwealth v. Clutter*, 419 Pa.Super. 275, 615 A.2d 362, 366 n. 7 (1992).

there was a payment made of $500.00. Can you tell me what happened that resulted in that $500.00 payment?

A: I had called him and I asked him when I could expect to receive the check, and he told me that he was going to reduce the payments to $500.00 every two weeks.

Q: Did he tell you why?

A: Yes. He told me that he knew what my mortgage was, he knew what my household expenses were, and he told me that was all I needed to keep the house going. And I thought about it, and I had to agree with him. It did pay my house expenses.

And so I told him that that would be fine with me, but I needed two months to get a full-time job or another job other than these two part-time jobs because they didn't pay anything, could he give me two months to get full-time employment and then that would be fine. And he said, no, it's done.

N.T. 4/27/98, at 26–27. Testimony elicited on cross-examination continued:

Q: Now, you testified on direct when your attorney asked you, you said that Artie had called you and asked if he could send less, and you said, yeah, you can send me $500.00 every two weeks, that's a thousand a month, I think I can get by with that?

A: No.

Q: You are saying now you didn't testify to that on direct?

A: I did not testify to that. I testified to the fact that I called and asked him when he was going to send me the money. He said I can't afford to send you this much anymore, I'm cutting it to $500.00 every two weeks. It's a thousand dollars a month, that's all you need, because he knew what my bills were.

He called me and asked me. He called me and asked me what all my expenses were. He said that's all you need, and I didn't say anything at that phone conversation. I thought about it for 24 hours. I called him back, and I said absolutely, you're right, that is all I need. Just give me two months to get a job, try to find a full-time job so I can get by on that.

Q: So are you saying that you accepted the $500.00 every two weeks?

A: Yes.

Q: As a reduced amount?

A: Yes, and he did not give me the two months' grace. He said it's done.

N.T. 4/27/98, at 45–46. Our reading of the above exchange reveals a classic example of conditional acceptance, at best. Such a scenario, without the parties' mutual agreement to the condition, cannot be the basis of a "meeting of the minds" or an intent to be mutually bound. *Yarnall v. Almy*, 703 A.2d 535, 539 (Pa.Super.1997). "A reply [to an offer] which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the offer.... [I]t is well established that the acceptance of any offer or counter-offer must be 'unconditional and absolute.'" *Id.* (citations omitted). Clearly, by immediately reducing his alimony payments to $500 bi-weekly, appellant evidenced a rejection of Connie's condition, thus terminating any germinating agreement. Further evidence of Connie's rejection of appellant's offer to reduce his alimony payments is contained at Petitioner's (appellee's) Exhibits 7 and 8, which are letters from appellee's attorney to appellant's attorney dated October 22, 1997, and November 12, 1997, protesting appellee's unilateral reduction in alimony payments. Quite simply, the record does not support any finding that an oral agreement to reduce alimony payments to $500 bi-weekly was entered into between the parties in September of 1997, or at any other time.

¶ 15 Appellant finally suggests, in his fifth question, that the trial court erred by taking a "paternalistic" approach to appellee's enforcement action, i.e., extending especial legal protection to appellee because she is a woman. But appellant fails to develop his argument beyond the mere statement that:

> The Courts in Pennsylvania have long held a paternalistic presumption that women were not knowledgeable nor able to understand contracts. Women are viewed as economically disadvantaged and generally uninformed, uneducated and readily subjected to unfair advantage in marital agreement.... Acknowledging the Commonwealth's equal rights amendment and advances women have made in society, the Court discarded the "paternalistic presumptions" and with them the test upon which previous agreements had been judged.

Appellant's brief, at 17–18, *citing Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990).[6] We find no evidence that the trial court took a paternalistic approach to appellee's petition, nor did it take liberties with its application of the law in order to find in favor of appellee.

¶ 16 The evidence overwhelmingly shows this case as one involving the continuing perpetration of deceit, misrepresentation, and betrayal by Artie. He initially sought the assistance of his ex-wife in order to mislead his mortgage lender, and vowed to her that she would not suffer a reduction in support because she helped him. She had deep reservations as to whether she could trust his representations.[7] Nevertheless, she agreed to help him, and presumably his new wife,[8] buy a new home and signed the addendum. Later, when his machinations got him what he wanted but led him into financial distress, he reneged on his pledge to Connie and unilaterally reduced the amount of support due her. When she complained and finally asserted her legal right to the agreed-upon amount of support, Artie completely abandoned any pretense of honoring his promise. He used the "addendum," onto which he had enticed her signature by means of entreaties to her sense of fair play and his promise to not

---

**6.** Appellant does go as far as to assert that "[t]he parties involved here are neither young nor poor nor uneducated." Appellant's brief, at 17. We note that the record does not support the assertion. No evidence of the parties' education levels is offered, and the testimony shows that, at the time the addendum was signed, appellant earned $70,000 per year, while appellee subsisted on less than $500 per month (not including the alimony payments from appellant).

**7.** Appellee testified on direct:

> A: And I said to him, Artie, I said, this requires an act of trust. And he said, I know, the ultimate act of trust.

N.T., 4/27/98, at 14. Appellant also testified on direct:

> THE WITNESS: She asked – she said to me, she said that, you know, she goes, well – her question was, if we wanted to change this, how would we go about changing it? And I told her that there are two ways to change an addendum, number one, to have a new addendum drawn up, or, number two, to discard the addendums. Her reply to me was that she was taking – if she did this, that she

would be taking a big chance in doing this.

N.T., 4/27/98, at 74. Appellant further testified on cross-examination:

> Q: Now, you were giving your testimony pertaining to the addendum agreement, and you said that you wanted to buy the home but you didn't qualify for it, and you were told that you needed a reduction in your alimony payments, and you told her and you asked her for this reduction, and I believe your testimony was that Connie's response was, you're asking me to take a big chance?
> A: No, her response was that she was taking a big chance.
> Q: But your testimony was she knew her alimony was being reduced, What big chance was she taking?
> A: I have no idea. That was just a comment that she made.

N.T., 4/27/98, at 100–101. As later events demonstrated, appellee's trust was sorely misplaced.

**8.** Appellant remarried in November of 1996, within two months of the date he unilaterally reduced his level of support payments to appellee.

give it legal effect, against Connie. Such a turn of events is objectionable under our laws whether the parties are any combination of man or woman, tycoon or pauper, savant or imbecile. The trial court correctly applied the laws of this Commonwealth, except as noted above, in a manner that did not take into consideration the parties' respective sexual, economic, or educational positions. Appellant's contention otherwise is meritless.

¶ 17 Order affirmed.

¶ 18 BECK, J., Concurs in the Result.