**BEAVER VALLEY ALLOY FOUNDRY, CO.,**
**Appellee,**

v.

**THERMA–FAB, INC., Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 20, 2002.
Filed Dec. 19, 2002.

Joseph E. Altomare, Titusville, for appellant.

John J. Petruch, Beaver, for appellee.

Before: JOHNSON, MUSMANNO and BOWES, JJ.

OPINION BY BOWES, J.

¶ 1 Appellant, Therma–Fab, Inc. ("Therma–Fab"), appeals from the judgment entered following denial of its motion for post-trial relief. We affirm.

¶ 2 The underlying action is a contract dispute between Therma–Fab and Beaver Valley Alloy Foundry, Co. ("BVA"). Therma–Fab sells large metal parts commonly used in the petrochemical industry, and BVA fabricates custom metal machine parts. In October 1996, Therma–Fab sent BVA a request for a price quotation on certain metal castings to be used as pipe hangers in a petrochemical furnace. On October 28, 1996, BVA transmitted a quotation via facsimile. BVA contends that the quotation was a two-page document and that the second page contained terms and conditions that included a provision entitled "Buyer's Remedy" which limited Therma–Fab's remedy for defects to repair and replacement. However, at trial, Therma–Fab denied receiving the second page of the BVA quotation.[1] On November 4, 1996, Therma–Fab transmitted three purchase orders requesting five metal castings. On the same date, BVA transmitted correspondence acknowledging Therma–Fab's orders. Therma–Fab concedes receiving the acknowledgements and further agrees that the acknowledgments contained language limiting its remedies to repair or replacement. Thereafter, Therma–Fab forwarded specifications which stated, *inter alia*, that the castings needed to surpass a threshold chemical penetration test and tensile analysis.

¶ 3 BVA manufactured the castings, but they failed to pass the chemical penetration test and tensile analysis. Despite repeated attempts, BVA was unable to cure the defect. BVA offered to recast the castings, but Therma–Fab asked BVA to deliver the castings despite the defects. On January 13, 1997, BVA delivered the castings to Therma–Fab's plant.

¶ 4 Following delivery, BVA submitted an invoice requesting the $11,137.36 contract price and $141.86 for hauling charges. Prior to receiving the invoice, Therma–Fab did not seek credit for possible costs associated with fixing the defective castings nor did BVA offer a discount. Therma–Fab refused to pay the amount stated in the invoice. After a bench trial, the court found in favor of BVA and against Therma–Fab. The trial court entered judgment against Therma–Fab in the amount of $17,072.06, including interest and attorney's fees. This appeal followed.

¶ 5 Therma–Fab raises the following issues on appeal: 1) whether it is entitled to set off its damages against the purchase price pursuant to the Uniform Commercial Code; 2) whether the trial court erred in admitting habit testimony concerning BVA's routine practice of faxing quotations to its customers; and 3) whether Therma–Fab is otherwise entitled to an equitable recoupment of a portion of its damages. We address these issues *seriatim*.

¶ 6 Therma–Fab's first issue involves the following facts. Prior to ordering the metal castings from BVA, Therma–Fab sold the castings to one of its customers. Therma–Fab claimed that it sustained expenses totaling $12,973 while it reworked the defective castings over a period of several weeks between their delivery to Therma–Fab's plant and their subsequent

---

1. Although Therma–Fab initially admitted that it received the terms of manufacture and sale, it subsequently amended its pleadings to reflect its present position.

shipment to the customer. According to Therma–Fab, it sustained 433 man-hours at a rate of $25.00 per hour to fix the castings. In addition, it used fifty pounds of rod-weld at a cost of $15.00 per pound. Further, Therma–Fab alleges miscellaneous freight and inspection expenses totaling $1,398. Therma–Fab had difficulty repairing the castings, and it was forced to deliver the castings twice before the customer finally accepted them. Six weeks passed between the date Therma–Fab refused BVA's offer to recast the parts and the date Therma–Fab's customer finally accepted the parts.

¶ 7 At the outset, we note that Therma–Fab rejected BVA's offer to recast the castings and demanded delivery despite knowledge of their defective condition. Therma–Fab did not utilize its right to reject the defective goods under 13 Pa.C.S. § 2601 [2] or repudiate the contract. Instead, Therma–Fab accepted the castings with full knowledge of the defects. Acceptance of goods occurs when the buyer, among other things, fails to reject or commits any act inconsistent with the seller's ownership. See 13 Pa C.S. § 2606(a).[3]

■ ¶ 8 Therma–Fab must pay for the goods it accepted under the contract. See 13 Pa.C.S. § 2607(a) ("The buyer must pay at the contract rate for any goods accepted."); see also In re Repco Products Corp., 100 B.R. 184 (Bkrtcy.E.D.Pa.) (1989) (pursuant to 13 Pa.C.S. § 2607(a), where nonconforming goods are accepted, buyer is liable for contract price irrespective of whether he is entitled to damages associated with nonconformity). However, Therma–Fab's acceptance of defective goods does not, in itself, preclude it from obtaining relief that it is otherwise entitled to under the UCC. Knowing acceptance of non-conforming goods merely prevents a buyer's subsequent rejection of the goods; it does not impair any other remedy provided by the code. See 13 Pa.C.S. § 2607(b).[4]

■ ¶ 9 Therma–Fab contends that it is entitled to set off its repair costs against

---

2. Section 2601 reads as follows:

**Rights of buyer on improper delivery**
Subject to the provisions of this division on breach in installment contracts (section 2612) and unless otherwise agreed under the sections on contractual limitations of remedy (sections 2718 and 2719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:
  (1) reject the whole;
  (2) accept the whole; or
  (3) accept any commercial unit or units and reject the rest.
13 Pa.C.S. § 2601.

3. Section 2606 provides as follows:

**What constitutes acceptance of goods**
(a) General rule.—Acceptance of goods occurs when the buyer:
  (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity;

(2) fails to make an effective rejection (section 2602(a)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
(3) does any act inconsistent with the ownership of the seller; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
13 Pa.C.S. § 2606.

4. Section 2607 provides, in pertinent part, as follows:

**(b) Effect of acceptance on remedies for breach.**—Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this division for nonconformity.
13 Pa.C.S. § 2607.

the contract price pursuant to 13 Pa.C.S. § 2714, which provides as follows:

**Damages of buyer for breach in regard to accepted goods**

(a) Damages for nonconformity of tender. Where the buyer has accepted goods and given notification (section 2607(c)) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the breach of the seller as determined in any manner which is reasonable.

(b) Measure of damages for breach of warranty. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(c) Incidental and consequential damages. In a proper case any incidental and consequential damages under section 2715 (relating to incidental and consequential damages of buyer) may also be recovered.

13 Pa.C.S. § 2714. The relief Therma–Fab seeks also is permitted under the common-law principle that allows a non-breaching party to set off its damages against the contract balance. This principle is embodied in 13 Pa.C.S. § 2717, which provides as follows:

**Deduction of damages from price**

The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

13 Pa.C.S. § 2717.

¶ 10 BVA counters that Therma–Fab contractually is proscribed from the setoff damages allegedly associated with the defective castings. According to BVA, the contract provides that Therma–Fab's exclusive remedy for a non-conforming good is repair or replacement. BVA relies on the contract term "Buyer's Remedy" that appeared on the reverse of the initial quotation that was faxed to Therma–Fab on October 28, 1996, and was included in the acknowledgments Therma–Fab received on November 4, 1996. The contract provision reads as follows:

BUYER'S REMEDY: Defective goods may be returned to the Seller after inspection by the Seller and upon receipt of definite shipping instructions from the Seller. Goods so returned will be replaced or repaired without charge. Every claim on account of defective material or workmanship or from any other cause shall be deemed waived by the buyer unless made in writing within thirty (30) days of the receipt of the goods to which such claim relates.

The forgoing shall constitute the exclusive remedy of the Buyer and the sole responsibility of the Seller. Beaver Valley Alloy Foundry Co. shall not be liable for any loss, damage or expense directly or indirectly arising from the Buyer's use of, or inability to use, the subject goods, or from any other cause. Should the goods prove so defective, however, as to preclude the remedying thereof by repair or replacement, then Buyer's exclusive remedy shall be refund of the purchase price paid and cancellation of the contract. Under no circumstances will the seller be liable for "consequential damages" of any kind.

Complaint for Confession of Judgment for Money, Exhibit B, ¶ 5.

¶ 11 Therma–Fab raises two contentions disputing that it is bound by the "Buyer's Remedy" provision: (1) the trial court erred in finding that the BVA quotation

formed the offer to the underlying contract; and (2) assuming *arguendo* that the BVA quotation constitutes the offer, it did not include the "Buyer's Remedy" provision. We reject both claims.

¶ 12 First, Therma–Fab contends that its purchase orders constituted offers that BVA accepted through correspondence acknowledging the sale. As noted, the trial court held that BVA's quotation formed the offer, which Therma–Fab accepted by forwarding its purchase orders. Since the issue of whether the BVA quotation constituted an offer presents a question of law, we employ *de novo* review of the trial court's determination. *See Seven Springs Farm, Inc. v. Croker,* 569 Pa. 202, 801 A.2d 1212 (2002) (meaning of unambiguous written instrument is question of law subject to *de novo* review).

¶ 13 Initially, we observe that the heading "quotation" does not affect the legal effect of the document. Some cases have construed quotations to be offers while others have determined that a quotation is merely an invitation to offer. *See* John E. Murray, Jr., *Murray on Contracts* § 35 (3d ed.1990). The inquiry concerns the nature of the document in the context of the surrounding circumstances. *Id.*

¶ 14 Our Uniform Commercial Code, (the "Code") 13 Pa.C.S. §§ 1101–9507, does not define "offer." However, this Court has defined an offer as "a manifestation of a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *O'Brien v. Nationwide Mutual Ins. Co.,* 455 Pa.Super. 568, 689 A.2d 254 (1997); Restatement (Second) of Contracts, § 24. Moreover, an offer to contract must be intentional and sufficiently definite in its terms. *See Stumpp v. Stroudsburg Municipal Authority,* 540 Pa.

391, 658 A.2d 333 (1995); *Columbian Rope Co. v. Rinek Cordage Co.,* 314 Pa.Super. 585, 461 A.2d 312 (1983) (no offer exists where purported offer is unclear on essential terms of contract).

¶ 15 According to the Restatement, "[I]n determining whether an offer is made[,] relevant factors include the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom a communication is addressed." Restatement (Second) of Contracts, § 26 comment c. In reaching this determination, we focus on the manifestations of the document. *See Espenshade v. Espenshade,* 729 A.2d 1239, 1243 (Pa.Super.1999) ("In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.") (quoting *Ingrassia Construction Co., Inc. v. Walsh,* 337 Pa.Super. 58, 486 A.2d 478, 483 (1984)).

¶ 16 For the following reasons, we agree with the trial court's conclusion that the BVA price quotation formed an offer. First, BVA sent the quotation to Therma–Fab in response to Therma–Fab's request for a price quote. Indeed, we construe Therma–Fab's request as an invitation to submit an offer. Further, the quotation contained detailed contract terms. It described the items that were the subject of the contract, listed the quantity of those items, addressed the terms of delivery, and the reverse side enumerated BVA's terms of manufacture and sale, including the "Buyer's Remedy" clause. Moreover, the quotation was unequivocal and not conditioned upon further approval by BVA or a third party. By the terms on the face of the document, the offer was subject only to the contract terms contained on the reverse side, which were expressly incorporated into the offer. In light of the above

factors, we conclude the written quotation included sufficient terms to form an offer. The quotation communicated BVA's commitment to fabricate and deliver the metal castings in exchange for Therma–Fab's performance under the terms contained therein.

■ ¶ 17 Alternatively, Therma–Fab posits that its purchase orders were not an acceptance of the BVA offer but rather, were counter-offers. This argument rests on the assertion that the purchase orders contained "significantly expanded terms." Appellant's brief at 9. However, Therma–Fab fails to discuss these expanded terms in its appellate brief or in the post-trial motions argued before the trial court. Furthermore, having reviewed the purchase orders, we find that the terms are consistent with the offer.

■ ¶ 18 According to the Code, the inclusion of additional terms in an acceptance does not prevent the formation of a contract. The additional terms are construed as mere proposals for inclusion in the contract, and between merchants, the terms become part of the contract unless

the offer expressly limited the terms of acceptance, the terms materially alter the contract, or the offeror objects to their inclusion. _See_ 13 Pa.C.S. § 2207(a) and (b).[5]

■ ¶ 19 In this case, the parties concede that they are merchants as defined by the statute, and we find that the additional terms do not materially alter the contract. The terms merely concern aspects of inspection and testing, and BVA did not object to their inclusion. Thus, the additional terms did not transform the acceptance into a counter-offer. Rather, the innocuous terms were incorporated into the contract.[6]

■ ¶ 20 Next, Therma–Fab argues that it is not bound by BVA's "Buyer's Remedy" provision because it did not receive the second page of the BVA quotation containing the terms of manufacture and sale. Therma–Fab reasons that the provision is not part of the contract because the first page of the BVA offer is silent as to remedies for defects.

---

**5.** Section 2207 provides as follows:

**Additional terms in acceptance or confirmation**

**(a) General rule.**—A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

**(b) Effect on contract.**—The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (1) the offer expressly limits acceptance to the terms of the offer;

    (2) they materially alter it; or

    (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

**(c) Conduct establishing contract.**—Conduct by both parties which recognize the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consists of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under other provisions of this title.
13 Pa.C.S. § 2207.

**6.** We note that this case does not present the classic "Battle of the Forms" scenario. The "Battle of the Forms" occurs only where the parties' conduct establishes a contract for sale in the absence of an agreed upon-writing. Instantly, Therma–Fab accepted BVA's offer without adding materially different terms. Therefore, the parties' subsequent conduct occurred in accordance with the terms of the contract. _See_ 13 Pa.C.S. § 2207(c).

¶ 21 Therma–Fab's argument implicates a factual controversy that the trial court resolved in favor of BVA. We will not disturb the trial court's factual finding absent an abuse of discretion, error of law, or lack of support in the record. *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.,* 777 A.2d 1090 (Pa.Super.2001). Moreover, as to issues involving credibility, we defer to the fact finder that had the opportunity to observe the demeanor of the witness. *Garr v. Peters,* 773 A.2d 183 (Pa.Super.2001).

¶ 22 At trial, Therma–Fab's president, Frank Johnson, testified that Therma–Fab did not receive the second page of the faxed quotation. Conversely, BVA introduced evidence of habit through the testimony of its president, John B. Forster. Over Therma–Fab's objections, Mr. Forster testified that BVA's routine business practice is to fax the reverse side of the quotation, which includes the buyer's remedy provision, whenever it sends a quotation via facsimile. The learned trial court found Mr. Forster's testimony to be credible. "After weighing the testimony of both parties concerning the receipt of the second page of the fax, this Court found Forster's testimony more persuasive." Opinion of the Honorable James P. Rowley, Senior Judge, 12/12/01, at 4.

¶ 23 In a related contention, Therma–Fab argues that the trial court erred in allowing BVA to introduce evidence of routine practice without first laying a foundation. The admissibility of evidence is within the discretion of the trial court. *Frey v. Harley Davidson Motor Co.,* 734 A.2d 1 (Pa.Super.1999). Thus, we will not reverse the trial court's determination absent an abuse of discretion or an error of law. *Cruz v. Northeastern Hospital,* 801 A.2d 602 (Pa.Super.2002).

¶ 24 The admissibility of habit testimony is controlled by Pa.R.E. 406. The rule provides as follows:

Evidence of the habit of a person **or of the routine practice of an organization,** whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization of a particular occasion was in conformity with the habit or routine practice.

Pa.R.E. 406.

¶ 25 Specifically, Therma–Fab claims that the testimony is inadmissible because BVA did not establish that the policy was in effect at the time in question or demonstrate that its employees actually follow the routine practice. The crux of Therma–Fab's position is that the trial court accepted Mr. Forster's testimony without requiring a sampling of specific instances indicating that the practice of sending the second page of the quotation was the regular uniform course of action.

¶ 26 Therma–Fab's position discounts our Supreme Court's express interpretation of Rule 406 that there is no set manner in which routine practice must be demonstrated. According to the comment to Rule 406, "Like the federal rule, Pa.R.E. 406 does not set forth the ways habit or routine practice may be proven, but leaves this for case-by-case determination." Pa. R.E. 406.

¶ 27 In *Baldridge v. Matthews,* 378 Pa. 566, 106 A.2d 809 (1954), our Supreme Court held that an organization's routine business practice may be established by introducing a knowledgeable witness's testimony that the routine practice existed. In that case, a hotel clerk testified that it was the uniform practice of the hotel to require payment in advance if the guests register without luggage. The trial court ruled that the testimony was admissible to demonstrate that the defendant and plain-

tiff's wife had baggage when they registered at the hotel. Our Supreme Court affirmed on the basis that evidence of uniform practice may be admitted without specific examples as long as the testimony indicates that the practice was performed with invariable regularity. *Id.*

¶ 28 Similarly, in *Frey, supra,* we relied upon *Matthews, supra,* and *Liles v. Balmer,* 389 Pa.Super. 451, 567 A.2d 691 (1989), in concluding that the trial court properly admitted evidence of a motorcycle dealership's routine business practice without requiring evidence of specific instances. In that product liability case, a representative of the dealership testified that the dealership had a routine practice of disconnecting the jumper wires on the motorcycles it sold. We affirmed the trial court's reliance on the witness's testimony to conclude that the dealership was responsible for an inoperable jumper wire that had been cut.

¶ 29 In light of the cases discussed *supra* and our Supreme Court's interpretation of Rule 406, we conclude that the trial court did not abuse its discretion or commit legal error in admitting Mr. Forster's testimony without corroborating testimony citing specific examples of conduct. Hence, the record supports the trial court's finding that the "Buyer's Remedy" clause was faxed to Therma–Fab as part of the offer it subsequently accepted. Since the "Buyer's Remedy" clause contractually limited Therma–Fab's remedies to repair and replacement, we find that Therma–Fab's extensive UCC arguments are inapplicable.

¶ 30 Finally, Therma–Fab asserts a right to an equitable recoupment of its damages contending that the right to recoupment is independent of any contract terms. However, as the trial court concluded, this argument is waived. Therma–Fab did not plead the defense of recoup-

ment in any pleading filed with the trial court. Pursuant to our rules of procedure, "A party waives all defenses and objections which are not presented either by preliminary objection, answer or reply...." Pa.R.C.P. Rule 1032. Instead, Therma–Fab pleaded cover a distinct remedy that involves purchasing substitute goods. Since Therma–Fab accepted the defective castings rather than seeking replacement goods, cover does not apply in this matter. Therma–Fab failed to preserve recoupment as a defense; thus, it is waived.

¶ 31 For all of the forgoing reasons, we affirm the trial court's denial of post-trial relief.

¶ 32 Judgment affirmed. Jurisdiction relinquished.